ESTHER KEAKAOKALANI KAMAU, BY HER GUARDIAN AND NEXT FRIEND, JOSEPHINE KAMAU LOVELL *v.* COUNTY OF HAWAII.

## NO. 3030.

DONNA JANE CUSHNIE, A MINOR, BY HER GUARDIAN AD LITEM, MARY CUSHNIE *v.* COUNTY OF HAWAII.

## NO. 3031.

Argued November 21, 1956.        Decided January 24, 1957.

RICE, C. J., STAINBACK AND MARUMOTO, JJ.

OPINION OF THE COURT BY STAINBACK, J.

These two cases, numbers 3030 and 3031, were consolidated for argument as both involve a single question of immunity or liability of the County of Hawaii for the negligence of its employees.

In case number 3030 the plaintiff-appellee filed a complaint by her guardian and next friend in the third circuit court of the Territory of Hawaii alleging that the County of Hawaii, a municipal corporation, operated and maintained the Hilo Memorial Hospital for hire and reward; that on September 30, 1950, plaintiff's mother, Esther K. Kamau, was admitted to said hospital as a paying patient to undergo a certain operation, namely a Caesarean section; that after the operation a blood transfusion was required and in the process of analyzing her mother's blood one of the hospital employees negligently and carelessly typed and cross-matched the blood and supplied her mother with the wrong type of blood; that as a result of the wrong type of blood being administered to the said Esther K. Kamau, she suffered an anaphylactic reaction and died therefrom on said date.

In case number 3031 the plaintiff-appellant filed a complaint by her guardian ad litem for tort against the County of Hawaii, a municipal corporation, claiming that the County operated a public park known as the Kawaihae park, near Kawaihae, district of south Kohala, and employed one Victor Laau as caretaker and custodian; that the County had certain rules and regulations governing the activities of persons using the park, and one regulation was that no bonfire was allowed on the sand beach of the park; that there was a sign posted within the park to the effect that no bonfire was allowed on the beach, and the County provided stone fireplaces away from the sand beach where those using the park might build fires. Appellant stated as a first cause of action that Laau, although on duty on that day, did negligently permit a bonfire to be

built on the sand beach and to burn for a period of some five hours, during which time it burned down to live coals covered with ashes, and that Donna Jane Cushnie, a child of two years of age, while running along the sand beach fell into the coals and was burned about the feet and left hand, resulting in pain and suffering as well as permanent injury to the fingers of the hand. A second and third cause of action stated substantially the same facts but alleged the negligence of the County in failure to keep the sand beach in a safe condition for play and for travel across.

In case number 3030 the defendant-appellant, County of Hawaii, demurred to the complaint on the ground that the operation of the Hilo Memorial Hospital was a "governmental" function and thereby it was immune from liability for the negligence of its employees.

In case number 3031 the defendant-appellee, County of Hawaii, demurred to the complaint on the ground that it did not contain facts sufficient to constitute a cause of action against the County, that the upkeep and maintenance of Kawaihae park was a "governmental" function and that, therefore, the County was not liable for the negligence of its employees in the exercise of such governmental functions.

The court overruled the demurrer in case number 3030 on the ground that operating a hospital and charging for its use was a "proprietary" function; in case number 3031 the court sustained the demurrer that the park was operated without charge and the operation and maintenance of a public park by the County of Hawaii was a "governmental" function.

An interlocutory appeal was allowed and duly perfected in each case.

The courts have stated time and again that a municipality is clothed with two-fold functions: (1) "governmental" and (2) private or "proprietary"; further, that

in the exercise of the "governmental" functions a municipality is an agent of the State and in the exercise of these powers it is exempt from liability for its failure to exercise them or for the exercise of them in a negligent or improper manner, but that for negligence in the exercise of "proprietary" powers a municipality is liable for damages in the same manner as an individual or a private corporation.

Though the so-called "rule" that the municipality is liable for torts committed by its agents in the performance of its private or proprietary functions but is not responsible for torts committed in the performance of governmental functions is almost universally acknowledged — it is a rare judicial opinion which does not pay homage to that formula — the criteria are valueless.

But this "bifurcated" municipal corporation was not always the rule. In 38 Illinois Law Review 355, 356, in an article on *Municipal Liability for Torts* by Professor Leon Green, Dean and Professor of Law at Northwestern University School of Law, after pointing out that most States and the Federal Government have provisions through which recoveries can be had for tort claims against the State itself or the Federal Government, states: "But the overwhelming number of tort claims, which grow out of the activities of thousands of smaller units of government — cities, towns, counties, boards and public corporate bodies generally — are met with a broad immunity from liability except as the courts give them recognition through judicial decision. *This immunity has been declared by many able judges to be without rational basis, if not the product of palpable error, yet few courts have had the courage to refuse it recognition or to modify it to any great degree.* In cases here and there, nearly all courts have succeeded by doctrinal maneuver in by-passing the immunity. But this oblique method of dealing with the problem has brought about so much confusion in the decisions that litigation in the field has become a snare. Inasmuch as the

courts have the same power to modify or deny the immunity altogether, as they had to create or give it recognition in the first instance, the problem is another one of many calling for a re-examination of their attitude towards the freedom of common law litigation." (Emphasis added.)

The same article then points out that the early American decisions made no distinction between public and private corporations in consideration of corporate tort liability. In 1802, the case of *Hooe* v. *Alexandria,* 12 Fed. Cas. No. 6666 (U. S. C. C. 1802) held the city liable and its decision made no distinction between the tort liability of public and private corporations. The later cases follow this line until *Bailey* v. *New York,* 3 Hill. 531, 38 Am. Dec. 669, "bifurcated" the municipal corporation. This case developed the dictum that a municipal corporation is liable only for the exercise of its "private" as distinguished from its "public" functions. Commenting on this dictum Professor Barnett said: "The distinction was reactionary and extremely unfortunate in that it limited the liability of municipal corporations to one class of functions in contradiction to the *prevailing* view (from which there was almost no dissent) that, logically and justly, applied the general principle of tort liability to all corporations alike, without distinction of functions."

However, as we have noted, this doctrine became accepted generally.

As to what is a "governmental" function and what is a "corporate" or "ministerial" act of a municipal authority is a question on which there is a wide divergence of opinion. The cases are in hopeless confusion and even in the same jurisdiction impossible to reconcile. (*Mark, Moo & Carter* v. *City & Co.,* 40 Haw. 338, 341.) The attempted distinction between "governmental" or "public" and "proprietary" or "private" activities of a municipality have been subjected to sharp criticism both by the courts — including the Su-

preme Court of the United States and our own latest decision on this point (*Mark, Moo & Carter* v. *City & Co., supra*) — and by legal scholars generally. We cited a number of these in our latest decision above referred to.

In 34 Harvard Law Review 67 it is said "An examination of the cases shows the futility, not to say absurdity, of any such distinction between governmental or public and corporate or private functions for the purpose of predicating tort liability."

Then, an article in 34 Yale Law Journal 229 cites numerous decisions which make distinctions without a difference and shows the absurdity of many of the decisions from the standpoint of logic and common sense. For example, in certain States where the cities, but not the counties or the State, are liable for defects in streets and roads, we must accept the distinction which enables a pedestrian who falls into a hole located on the city line to recover damages if he fell on the city side (*Fleming* v. *City of Memphis*, 126 Tenn. 331, 148 S. W. 1057) but deny him relief if he fell on the county side (*Wood* v. *Tipton County*, 7 Baxter 112 [Tenn.]), and the cases where the maintenance of a city dump would produce liabiliay for the injury to the property of an adjoining owner but not for personal injury, the first being based upon the theory of a nuisance, or the negligent maintenance of a sewer system which merely causes illness to persons without involving trespass upon the property produces no liability, while the invasion of a property right would give the injured party a right to recover.

In 34 Yale Law Journal 129 the following statement is made relative to the confusion existing regarding the liability or immunity of a municipality for tort:

"It is when we come to the municipal corporation as an agency of the public power that we find the greatest confusion to prevail, not only as to the substantive liability

or immunity of the corporation in tort, but as to the grounds upon which the liability or immunity, as the case may be, properly rests. In few, if any, branches of the law have the courts labored more abjectly under the supposed inexorable domination of formulas, phrases and terminology, with the result that facts have often been tortured into the framework of a formula, lacking in many cases any sound basis of reason or policy. This is notably the case in the effort to apply the supposedly settled rule that the municipal corporation is not liable for torts committed by its agents in the performance of governmental, political or public functions, whereas it is liable when the tort is committed in the performance of corporate, private or ministerial functions. Not all courts, however, are equally submissive to the commands of a ritual; so that we find the utmost confusion among the courts in the attempt to classify particular acts of state agents as governmental or corporate. Disagreement among the courts as to many customary municipal acts and functions may almost be said to be more common than agreement and the elaboration of the varying justifications for their classification is even less satisfying to any demand for principle in the law."

Again, in the editorial note in 75 A. L. R. 1196 the following comment is made: "On no subject, perhaps, is there more confusion among the decisions, than that of municipal liability for torts. The rule of governmental immunity is subject to a great number of exceptions, many of which are purely arbitrary and without any relation to the grounds upon which the courts please to base the general rule. The whole doctrine of governmental immunity from liability for torts rests upon a rotten foundation."

There are scores of articles, including hundreds of cases, discussing the tort liability or immunity of municipalities. In addition to those previously mentioned, many

are contained in numerous volumes of A. L. R., in 28 Columbia Law Review, 6 Southern California Law Review, 78 University of Pennsylvania Law Review, 54 Harvard Law Review, and many others. In a recent article in the Minnesota Law Review (vol. 40, no. 7, p. 777, of June 1956) it was stated: "So many law review articles have been written on the subject that one of the most useful articles is a survey of the literature." (See Repko, *American Legal Commentary on the Doctrines of Municipal Tort Liability,* 9 Law & Contemp. Prob. 214 [1942].) The Minnesota Law Review article, *supra,* points out a quotation of a Massachusetts opinion to the effect that "'The underlying test is whether the act is for the common good of all without the element of special corporate benefit, or pecuniary profit. If it is, there is no liability; if it is not, there may be liability.' No wonder this distinction causes confused law! If this 'underlying test' is applied to the cases the court discussed, then garbage removal is 'for the common good of all,' but sewage removal is not; a hospital is 'for the common good of all,' but a waterworks is not. How could the Virginia court get any guidance from this test and these precedents on the question whether the swimming pool was 'for the common good of all'?"

This same Minnesota Law Review on page 778 stated: "The absurdity of the classification is increased when proprietary or governmental characteristics of an activity are mixed. As one writer has observed, one state has both governmental electricity and proprietary electricity, and another state has both governmental manholes and proprietary manholes. But what if the same manhole serves both governmental purposes and proprietary purposes? That question arose concerning an elevator in a City-County Building which carried people to governmental and proprietary and mixed offices; the court despaired of its task of trying to 'unscramble the mixed relations' and it

held: 'The fact that some of the activities centered in this building are exclusively of a purely governmental nature will not affect liability, when they are joined with business activities.' What a preposterous problem!"

Allan F. Smith, a Professor of Law at the University of Michigan, in an article entitled *Municipal Tort Liability* in 48 Michigan Law Review 41, states at pages 44, 45:

"The results of such a doctrine [classifying a municipal function as "governmental" or "proprietary"] have been rather startling. With few exceptions, the same function has been called governmental by the courts of one state, and proprietary by those of another. No further proof should be required to demonstrate that there is nothing inherent in particular functions by which they can be classified. * * * The city's electric light plant furnished direct current for the purpose of lighting the streets and public buildings. It sold alternating current to inhabitants for use in their homes. It was held that since the injury resulted from negligence in maintaining the wires carrying alternating current, which was sold for profit, the city was liable. The court stated, however, that the city would not be liable 'for the negligence of its . . . agents . . . when furnishing the service for lighting its public streets.' Thus we distinguish between governmental electricity and proprietary electricity. In Georgia, when a city engages in furnishing water to its inhabitants, it is generally said that it acts in a private, proprietary capacity, and is therefore liable for the negligence of its agents. Yet, when an employee negligently left open a box leading to the water pipes which supplied water to a pool in a public park, the court declared that there was no liability. We must, then, distinguish between proprietary manholes and governmental manholes. The tendency of courts to emphasize the element of profit being made by the municipal corporation leads to speculation as to what the result

might be where the city, as a community enterprise, collects certain kinds of garbage without charge, but makes a charge for collection of other kinds. No doubt it might be argued that a distinction must be made between proprietary garbage and governmental garbage."

*Mirabile dictu!* The territorial supreme court has indeed made this distinction between "proprietary garbage" and "governmental garbage." In *Maki* v. *City & Co.,* 33 Haw. 167, it held the City and County liable in an action for tort for the negligence of its employees in removing rubbish but stated it would not be liable in the removal of "wet garbage." The distinction was based on the theory that the removal of rubbish was not a necessary protection for the public health but the removal of "wet garbage" or kitchen refuse was. But, as stated in *Mark, Moo & Carter* v. *City & Co., supra,* the removal of dry garbage or trash is a "governmental" function in so far as the protection of the health of the community is concerned. We took judicial notice that when the bubonic plague broke out in Honokaa, one of the first orders issued by the governor under his war powers was to have all trash cleared up that might harbor rats within a certain distance of residences. This was because trash might harbor rats whose fleas transmit the plague. Further, it harbors cockroaches and other disease-carrying insects.

What would our supreme court have decided had the truck been carrying wet garbage as well as dry rubbish?

Mr. Bumble had probably been reading the conflicting decisions on municipal liability for torts when he made his famous statement "If the law supposes that, the law is a ass."

There has been a great expansion of governmental activities in modern times. Activities which are now taken for granted as governmental were formerly left to private initiative, such as education; collection of sewage and

rubbish; there was not even a municipal police force until 1829 when Sir Robert Peale established the London police force, from whose name the term "bobbies" was applied to police; volunteer fire departments were in many cities, and in New York the volunteer fire organization was Boss Tweade's chief political strength. The furnishing of water is still regarded as a proprietary function although nothing is more important to the health of the community than a pure water supply. "Pure water is man's greatest need" is the slogan of the Honolulu water supplier.

In view of this, it is not strange that the tendency of modern times is to extend the liability of municipalities for tort actions. In a number of jurisdictions this has been done by court decisions, in others by statute, and the United States Government has enacted a Tort Liability Act, all showing keen dissatisfaction with the present condition of the law of governmental immunity for torts as declared by the decisions.

As this welter of decisions has resulted in so much confusion, absurdity and injustice, it may be well for us to go to the basis for the so-called "rule" of nonliability of a municipal corporation for certain of its torts. It is time to take new bearings and see how far we have drifted from logic and common sense. As stated by Daniel Webster, "When the mariner has been tossed for many days in thick weather, and on an unknown sea, he naturally avails himself of the first pause in the storm, the earliest glance of the sun, to take his latitude, and ascertain how far the elements have driven him from his true course." (Webster's second speech on Foot's Resolution.)

It is settled that the United States and the various state governments cannot be sued without their consent. The theory of nonliability of municipal corporations is that the State being sovereign no suit can be brought against it without its consent, and a municipality in performing

"governmental" functions is the agent of the State and, therefore, is exempt from suit.

The immunity of the sovereign power is sometimes said to be a survival of the maxim that "The King can do no wrong." "The King can do no wrong" originated in the fact that the king could not be sued in his own court; as chief of the feudal system he had no court above him in which he could be held liable, just as a feudal lord could not be sued in his own court. It was not until after the breakdown of feudalism that the king became identified with the State.

"* * * 'we are plunged into talk about kings who do not die, who are never under age, who are ubiquitous, who do no wrong and (says Blackstone) think no wrong; and such talk has not been innocuous.' The ancient maxim that 'the King can do no wrong' took on new meaning and came to stand for a notion that the sovereign was incapable of doing wrong. This was a substantive ground of immunity in addition to the mere lack of a court with power to enforce remedies against the king.

"Just how an immunity which had its roots in feudalism and in a political philosophy associated with the divine right of kings was transplanted to the new republic in America remains something of a mystery." (22 University of Chicago L. Rev., No. 3, pp. 611, 612, quoting from Watkins, *The State as a Party Litigant.*)

But, as stated by Mr. Justice Holmes in *Kawananakoa* v. *Polyblank,* 205 U. S. 349 (incidentally, this sustains a decision of our own territorial supreme court), "A sovereign is exempt from suit, *not because of any formal conception or obsolete theory, but on the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends* * * *." (Emphasis added.)

Blackstone states that the evidence of legal "right" is

found in the exercise of the *legal remedy* and the law "presumes" no injury where it has provided no remedy. (1 Blackstone Comm. 239, 245.)

An individual has a right as against the world to be free from damage to his property or injury to his person by the tortious acts of another, and the ordinary rule is that for the violation of such right he may recover his damages; "for every wrong there is a remedy." The exception to this rule, that a person so injured or damaged may not recover from a sovereign State is not that his rights have not been invaded, but that the State is *immune to suit*. Some of the authorities point out that there is a difference between immunity to suit and an immunity to liability; that the first may be a personal immunity. The Austinian theory that a legal right exists only where there is a legal remedy is somewhat analogous to the denial of the existence of a disease that injures and cripples thousands because there is no remedy for such disease.

Although the rule of sovereign immunity has itself been subjected to repeated and sharp criticisms by many courts (see editorial note 25 A. L. R. [2d] 208, and *Hoggard* v. *Richmond* [Va.], 200 S. E. 610, 120 A. L. R. 1368, quoting editorial note in 75 A. L. R. 1196), it by no means follows that municipal corporations have an immunity similar to sovereign States. Most of the courts apparently accept as axiomatic the statement that a municipality is not liable for torts in the performance of so-called "governmental" functions and give no reasons therefor; others find many and diverse reasons thicker than blackberries — all equally without merit.

As stated in 34 Harvard Law Review 67, 68: "Five reasons have, at one time or another, been given: 1. The state is sovereign and the municipality its governmental agency: no suit can be brought against the state without its consent, therefore none against the municipality; 2. The

municipality derives no pecuniary benefit or profit from the exercise of public functions; 3. Members of municipal departments in the exercise of public duties are not agents of the city, therefore the doctrine of *respondeat superior* has no application; 4. It is necessary for the proper performance of governmental functions that a municipal corporation should not be liable for the negligence of its servants; 5. Municipalities should not be liable for torts committed in the performance of duties arbitrarily imposed by the legislature, but should be liable only for those committed in performance of duties voluntarily assumed under general statutes. None of these reasons is sound. The immunity of a sovereign from suit rests upon no 'formal conception, or obsolete theory, but on the logical and practical ground that there can be no legal right as against the authority that makes the law on which that right depends.' This conception does not underly a municipal corporation. In admiralty, for example, it is well settled that a municipal corporation is liable for the torts of its servants. Moreover, tort liability is not based upon a benefit derived by the tortfeasor. Nor does the character of the service rendered determine the fact of agency; but rather the determining factors are whether the principal employs, pays, controls, and dismisses the servant. In answer to the fourth reason, proper performance of public duties can hardly be said to rest upon the immunity of a public corporation for willful and negligent conduct of its employees. Finally, the voluntary assumption of an unquestioned duty has never been the starting point for liability in the law of torts."

Again, in the editorial note on municipal immunity from liability for torts, at page 1377 of 120 A. L. R., it is stated:

"The doctrine of immunity has been predicated on various grounds. 'In the final analysis the immunity rests

upon three grounds; first, the technical rule that the sovereign is immune from suit; second, the ancient idea that it is better that the individual should suffer an injury than that the public should suffer an inconvenience; and third, that liability would tend to retard the agents of the city in the performance of their duties for fear of suit being brought against the municipality.' 23 Mich. L. Rev. 325, 337.

"The first of these grounds is based upon the ancient idea of the divine right of kings and upon the maxim that 'the king can do no wrong.' Its observance in a modern democracy is a glaring anachronism. Moreover, this doctrine constitutes an impediment to suing the sovereign at all and would apply as well to proprietary functions as to those of a governmental character. When municipalities are made subject to suits generally, the maxim in question is abrogated in toto, and it constitutes no good reason for limiting liability to matters pertaining to proprietary functions.

"The mere statement of the second ground condemns it. True democratic principles do not countenance the doctrine that it is better that an innocent individual should suffer a great injury without remedy than that the community at large should be subjected to the risk of slight inconvenience. As indicated in an earlier annotation, the damage resulting from the wrongful act of the government should be distributed among the entire community constituting the government, where it could be borne without hardship and where it justly belongs, rather than imposed entirely upon the single individual who suffers the injury. * * *

"The third ground is purely argumentative; and, so far as the argument goes, it supports the opposite rule as much as it does the doctrine of immunity. For it may be urged that the recklessness of municipal employees and

officers needs to be 'retarded,' and if the abrogation of municipal immunity would operate as a deterrent upon the negligence of such persons, it would serve a highly desirable end."

As we have pointed out, the immunity of the sovereign State rests on the doctrine that the State which makes the laws is immune to suit, but no such reasoning can be indulged in on behalf of a municipal corporation. A municipal corporation does not make the laws under which suits are instituted against it. As to the alleged exemption of a municipal corporation as agent of the State, the ordinary rule is that an agent has only such immunities of the principal as are not personal to the principal. (2 Restatement, *Agency*, p. 347.) As an employee or servant of the State is not immune for torts committed by him in performance of the business of the State, there seems no good reason why a municipal corporation should be exempt while acting in its "governmental" capacity as the so-called agent of the State.

"Persons may have a personal immunity from liability with respect to all persons and for all acts, as in the case of the sovereign, or for some acts, as in the case of an insane person, or as to some persons, as in the case of the immunity of a husband to the wife. Such immunities result from the personal qualities of the individual or the personal relationship of the parties. Unlike certain privileges (see § 346), such immunities cannot be delegated. * * *" (2 Restatement, *Agency*, § 347.)

*Hopkins* v. *Clemson College,* 221 U. S. 636, in holding that a state agricultural college corporation was not immune to suit, said the immunity from suit is a high attribute of sovereignty which cannot be availed of by public agents when sued for their own torts; that in such case the law of agency has no application and the individual is liable to suit.

*Keifer & Keifer* v. *R. F. C.,* 306 U. S. 381, held immunity from suit of a government corporation is not necessarily to be inferred from the fact that the corporation is doing the government's work or from the omission of the conventional sue and be sued clause in the charter, because the government cannot be sued. "Therefore, the government does not become the conduit of its immunity in suits against its agents or instrumentalities merely because they do its work. *United States* v. *Lee,* 106 U. S. 196, 213, 221; *Sloan Shipyards* v. *U. S. Fleet Corp.,* 258 U. S. 549, 567."

As would be expected from our foregoing discussion, there is a split of authorities on the question of liability of a municipal government for torts in connection with the operation of a hospital and also for torts in connection with the upkeep and maintenance of public parks.

Practically all of the cases hold that where a hospital is operated in the performance of a "governmental" or public function there is no liability, but in a "proprietary" or private function there is; however, as heretofore stated, there is no standard for determining whether the hospital is operating in the performance of a "governmental" or "proprietary" function.

In 25 A. L. R. (2d) 210 the note cites cases from some twenty-two jurisdictions to the effect that a municipality is exempt from tort liability where the hospital is maintained and operated in the exercise of "governmental" functions; in the same note cases are cited from ten jurisdictions holding that a governmental unit or agency is not immune from liability for torts committed in connection with operating a hospital where it is operated in the performance of a proprietary or corporate function.

While no general standards uniformly applicable can be derived from the authorities for determining whether the hospital is operated as a governmental agency or unit

or is a proprietary function, there are many decisions to the effect that where there is revenue derived from the operation of such hospital they are proprietary. On the other hand, probably more numerous decisions hold that the governmental character may exist even though charges were made and the revenues were in excess of the expenses. Some authorities base immunity of the governmentally operated hospitals, so far as charity patients are concerned, on the doctrine of the immunity of charitable trusts.

An exception to the general rule of nonliability where operating a hospital is in the performance of a "governmental" function, is where the maintenance of the hospital is regarded as constituting a nuisance or where there is injury to private property. This is frequently based on constitutional provisions against taking private property without compensation; yet it is a shocking doctrine that no immunity attaches where property rights are violated by governmental action but immunity does attach where it is a matter of the life or limb of a human being. (25 A. L. R. [2d] 210, note.)

On the other hand, although the weight of American authority in numbers is that the maintenance of a hospital by a municipality for the purpose of conserving the public health, treating indigent patients, and applying money receipts to expenses is the exercise of a governmental rather than a proprietary function, in England and in Canada the governmental public body operating a hospital is liable for the negligence of its servants in the same way as private individuals would be liable under similar circumstances and notwithstanding its acting in performance of public duties of eleemosynary and charitable functions. (*Hillyer* v. *Governors of St. Bartholomew's Hospital* [1909], 2 KB 820, 9 BRC 1-CA; *Cassidy* v. *Ministry of Health* [1951], 2 KB 343-CA.)

There is the same split of authority as to whether the maintenance of a public park is a so-called governmental function or a proprietary one. The weight of authority is that a municipality in maintaining a public park is engaged in a governmental activity and therefore not liable for torts of its agents. But there are authorities from some sixteen jurisdictions that a municipality must exercise ordinary care in establishing, equipping and caring for public parks to make them reasonably safe for persons frequenting and using the parks and their equipment and that a municipality is subject to liability for injuries resulting from its failure to do so. (142 A. L. R. 1350.)

Some authorities also take the view that there must be adequate supervision of the park as well as reasonable care for its maintenance. Some authorities, as previously stated in the cases of hospitals, make a distinction between the case of a park where a charge is made for its use and one where its use is free. There are also authorities holding a city liable because of the creation of attractive nuisances. It is unnecessary to review the numerous decisions as there exists the same confusion and conflicting opinion as in the case of hospitals.

Finally, we have the territorial case of *Wax* v. *City and County*, 34 Haw. 256, which held "Where a municipality owns and controls public parks there is imposed upon it the legal duty to use ordinary care to keep such parks in a reasonably safe condition for the public rightfully using the same." This case may be distinguished as defendant made no claims for exemption from liability upon the ground that the municipality was exercising a governmental or public function and, further, the injury was caused by pipes stored in the park for use in a street adjoining the park.

In addition to the *Wax* case, *supra*, there are several

Hawaiian cases dealing with the question of municipal liability for torts.

The earliest case, *Matsumura* v. *County of Hawaii,* 19 Haw. 18, held the County liable for the negligence of its servants who, in constructing·a highway, diverted a stream of water so that it undermined a large mound or bank consisting of earth and rocks which fell upon plaintiff's land, struck and damaged his store, dwelling house, stables, etc. This decision apparently turns on the "direct invasion of plaintiff's right as an adjacent land owner."

The case of *Halawa Plantation* v. *County of Hawaii,* 22 Haw. 753, held the County liable for damages caused to a crop of cane by a fire started by road employees of the County acting within the scope of their employment.

The next case is that of *Reinhardt* v. *Maui,* 23 Haw. 102, which held the County liable for failing to repair a defect in the public highway or to guard against injury therefrom resulting in personal injury to one lawfully traveling upon the highway.

On the other hand, there is the case of *Perez* v. *City & County,* 29 Haw. 656, which held the City and County was not liable in damages for injury to a person caused by the negligence of its agents and servants in operating a fire engine and a police patrol wagon, the court holding the acts complained of which resulted in injury to the plaintiff were done in the performance of governmental functions.

Then we have the case of *Maki* v. *City and Co.,* 33 Haw. 167, which held that the City and County was liable in an action for damages for the negligence of its employees in removing dry rubbish but stated it would not be liable for removal of "wet garbage."

Finally, we have the case of *Mark, Moo & Carter* v. *City & Co.,* 40 Haw. 338, which held the City and County liable to private individuals for damages by fire caused by the negligence of its officers, employees, etc., in permitting

electric current to escape from its street-lighting system to a telephone wire and flow into and upon plaintiff's private property. This case followed the reasoning in the first case, *Matsumura* v. *County of Hawaii, supra,* in that it was an invasion of plaintiff's right.

Thus we have six Hawaiian supreme court decisions stating that the municipality is immune where the tort is committed in carrying out governmental functions but not immune when carrying out proprietary functions. Although each of these cases contains dictum, only one of the decisions, *Perez* v. *City and County, supra,* actually holds that the municipality is immune in the case before it, where a tort was committed jointly by the police and fire departments. In the *Matsumura* case, the *Halawa Plantation* case and the *Mark, Moo & Carter* case, *supra,* the municipal corporation was held liable because it was a direct invasion of plaintiff's right as an adjacent land owner, a tresspass in the first case by water, in the second case by fire, and in the third case by electricity. The *Reinhardt* case held the County liable for failure to repair a street; and the *Maki* case held that the city was liable for damages occasioned by the negligent operation of a non-governmental function, namely, the hauling away of dry garbage as distinguished from hauling "wet garbage" which would be a governmental function.

The *Perez* case, at page 660, stated: "It is contended by the plaintiff that section 1721 R. L. 1925, authorizes the maintenance of suits against the City and County of Honolulu for acts done in the performance of its governmental functions as well as those done in the performance of its administrative functions. The pertinent portion of the section is as follows: 'Suits, actions and proceedings may likewise be brought against said city and county, at law or in equity, for the recovery of any money, property or thing belonging to any person, corporation, or the Terri-

tory, or for the enforcement of any rights of, or contracts with, or damages against, said city and county * * *.' The plaintiff's construction of this section is erroneous. Its manifest purpose is to authorize suits against the city and county when a cause of action which is recognized by law arises. It does not purport to enlarge the liability of the municipality so as to include acts for which it would not be liable at common law."

This *Perez* decision if not logical is at least in line with the authorities, particularly of that date (1927), which hold with the statement in 34 Yale Law Journal 9: "So strongly entrenched in the judicial mind is the principle of immunity in tort that legislative consent to suit, though granted in the broadest language, has been deemed to exclude liability for tort."

Although the section (R. L. H. 1945, § 6202) under which the current suits are brought against the County of Hawaii differs from the provision of the statute involved in the *Perez* case in that under the provisions of its general powers and limitations the only provision relative to suits is the county has power "to sue and be sued in its corporate name," we do not deem this difference material.

Contrary to the *Perez* case, the Supreme Court of Hawaii held under an early Hawaiian statute (since repealed) reading that "Whenever any citizen of this Kingdom, or other person, shall have a claim or claims against the Hawaiian Government which said government shall refuse or neglect to satisfy or adjust, it shall be competent for such person to bring and maintain a suit or suits against said government in any appropriate court of record of the Kingdom for the purpose of adjudicating such claim or claims" (Laws of 1888, c. 51), the Hawaiian Government surrendered its exemption from suits on account of torts of its servants as well as contracts. (*High* v. *Hawaiian Government*, 8 Haw. 546; *Dillingham* v. *Hawaiian*

*Government,* 9 Haw. 101.) In these cases the claim was urged that the words only authorized suits against the government based on contracts, but the court refused to take this view, holding "* * * we take the ground that the word 'claim' is not only one of a very broad meaning, but there is nothing in the statute to show that it is not intended to be used in its broadest sense."

In determining whether a tort claim under the United States Tort Claims Act has arisen "in accordance with the law of the place where the act or omission occurred," it was held that it is immaterial that in such place the municipal corporation is exempt from liability on the ground that it was exercising a governmental function. (*Herring* v. *United States,* 98 F. Supp. 69.)

However, because this court in one decision and the dicta in several other decisions has enunciated the doctrine that a municipality is not liable in tort where the acts are governmental in character and not proprietary, we are met with the doctrine of *stare decisis.*

As stated in *Tuengel* v. *City of Sitka, Alaska,* 118 F. Supp. 399, 400: "Immunity from suit is in disfavor in the United States because it is an anomaly in a republic and because of general recognition of the fact that it is unjust to make the innocent victim of negligence bear the entire loss rather than to distribute the burden among the members of the general public. Notwithstanding the manifest injustice of the doctrine, courts continue to hold political subdivisions immune from suit as well as liability because of the doctrine of stare decisis." (This case cites *Madison* v. *City and County of San Francisco,* 106 Cal. App. [2d] 232, 234 P. [2d] 995.)

*Pierce* v. *Yakima Valley Memorial Hospital Association,* 260 P. (2d) 765, in abandoning its previous rule of immunity for charitable hospitals, held that since the rule was created by the courts it might properly be modi-

fied or abandoned by them, citing 38 Columbia Law Review 1485, 1489, and *Borst* v. *Borst*, 41 Wash. (2d) 642.

"*Stare decisis* is primarily a doctrine by which a Supreme Court keeps the other courts of a judicial system in line. * * * The doctrine of *stare decisis* was never intended to tie the hands of a Supreme Court and prevent it from correcting its own errors, or from making adjustments in the law to meet the needs of people who must rely on the courts for the protection of their interests." (*Freedom of Litigation*, by Leon Green, 38 Illinois L. Rev. 117, 118.)

"However great the factors in the everyday world that call for change in the law, a Supreme Court will make the change only after a long and terrific emotional struggle." (38 Illinois L. Rev. 118.)

An example cited by Professor Green for such a struggle is found in the long continued attack on *Swift* v. *Tyson*, 16 Pet. 1 (1842), which culminated in *Erie R. R. Co.* v. *Tompkins*, 304 U. S. 64, 114 A. L. R. 1487 (1928), the latter case holding there is no Federal general common law, contrary to *Swift* v. *Tyson*. Mr. Justice Reed in concurring in the conclusion stated: "In this Court, stare decisis, in statutory construction, is a useful rule, not an inexorable command."

Chief Justice Bleckley in *Ellison* v. *Georgia R. R. Co.*, 87 Ga. 691, 695, 13 S. E. 309 (1891), made the following observation: "Some courts live by correcting the errors of others and adhering to their own. * * * With these exalted tribunals, who live only to judge the judges, the rule of *stare decisis* is not only a canon of the public good, but a law of self-preservation. At the peril of their lives they must discover error abroad and be discreetly blind to its commission at home."

On the point that after construction of a statute by the court, the legislature by not modifying the same has there-

by approved such construction, see *Helvering* v. *Hallock,* 309 U. S. 107, syllabus, as follows:

"*Stare decisis* is a principle of policy and not a mechanical formula of adherence to the latest decision, however recent and questionable, when such adherence involves collision with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience. * * *

"The right and duty of this Court to re-examine an untenable or undesirable construction placed by itself upon a revenue provision are not impeded by the failure of Congress and of the Treasury to take steps to avoid such construction through legislative amendment."

We have the right and duty to examine the former decisions and dicta of this court that a municipality in exercising its so-called "governmental" or public functions is exempt from tort liability but there is no such exemption in the exercise of its "proprietary" or private functions. This is particularly true in these cases as the decisions involve no rule of property. We have cited numerous decisions and articles by legal scholars that the distinction between so-called "governmental" and "proprietary" functions cannot be made with any degree of justice and fairness; that the decisions are full of contradictions and absurd conclusions as to what are "governmental" functions and what are "proprietary" functions, even in the same jurisdiction.

Where the same jurisdiction has both "governmental" manholes and "proprietary" manholes (the first connected with the sewer system, the second with the water), "governmental" and "proprietary" electricity (the latter being direct current run into houses), and our own "proprietary" garbage (dry) and "governmental" garbage (wet), and many others equally absurd, is it not a fair conclusion that such construction of the statute giving the counties the power to sue and be sued, comes within the provisions

of section 13 of the Revised Laws of Hawaii 1945 that every construction of a statute which leads to an absurdity should be rejected?

In view of the wide expansion of governmental activities over a period of years — national, state and municipal — many matters that were considered primarily private functions to be carried out by private industry are today carried out by various branches of the government.

The so-called test as to whether the service performed is for the common good of all is worthless as all functions performed for which public funds are expended are deemed for the public benefit.

Conditions change with the times and our decisions must meet changing conditions. The law is not static but consists of fundamental principles and reasons and the substance of rules as illustrated by the reasons on which they are based rather than the mere words in which they are expressed. It must adapt itself to various conditions as interpreted in the light of modern experience, reason and the furtherance of justice. (*Territory v. Alford*, 39 Haw. 460; *Dole v. Gear*, 14 Haw. 554.)

We are of the opinion that the narrow rule heretofore followed as to so-called "governmental" or public functions and "proprietary" or private functions should not control the question of municipal liability for its torts; that where its agents are negligent in the performance of their duties so that damage results to an individual, it is immaterial that the duty being performed is a public one from which the municipality derives no profit or that it is a duty imposed upon it by the legislature.

We therefore hold that it is the duty of the County of Hawaii to use ordinary care to keep the parks in a reasonably safe condition for the public rightfully using them regardless of the fact that no charge is made for the same, and that the County in operating a hospital for the care

of the sick is under the obligation to use ordinary care to prevent injury to the patients therein.

The order overruling the demurrer in the case of Esther Keakaokalani Kamau, by her guardian and next friend, Josephine Kamau Lovell (number 3030) is affirmed, and the order sustaining the demurrer in the case of Donna Jane Cushnie, a minor, by her guardian ad litem, Mary Cushnie (number 3031) is reversed.

*Martin Pence* (also on the brief) for appellee in Case No. 3030 and for appellant in Case No. 3031.

*Yoshito Tanaka,* County Attorney, Hawaii County, Territory of Hawaii (also on the briefs), for appellant in Case No. 3030 and for appellee in Case No. 3031.