SELWYN A. ROBINSON, et al., Plaintiffs-Appellees, *v.* GEORGE R. ARIYOSHI, Governor, et al., Defendants-Appellants, and McBRYDE SUGAR COMPANY, LIMITED, et al., Defendants-Appellees

NO. 8241

(9TH CIR. NO. 77-2264)

DECEMBER 29, 1982

RICHARDSON, C.J., LUM, NAKAMURA, HAYASHI, JJ., AND RETIRED JUSTICE MENOR, IN PLACE OF PADGETT, J., DISQUALIFIED

OPINION OF THE COURT BY RICHARDSON, C.J.

Six questions relating to the interpretation and effect of our decision in *McBryde Sugar Co. v. Robinson,* 54 Haw. 174, 504 P.2d 1330, *aff'd on rehearing,* 55 Haw. 260, 517 P.2d 26 (1973), *appeal dismissed for want of jurisdiction and cert. denied,* 417 U.S. 962 (1974) (hereinafter *McBryde*), have been certified to us by the United States Court of Appeals for the Ninth Circuit under rule 20 of this court which permits us to answer state law questions determinative of a cause before the Supreme Court of the United States or any court of appeals of the United States.

The action before the court of appeals serving as the source of the questions involves an attempt by private landowners in the Hanapepe Valley to obtain federal court relief from our decision in *McBryde* delineating rights and interests in and to the waters of the Hanapepe River system. The federal district court sitting in Hawaii, for reasons discussed more fully below, agreed with the landowners that portions of the decision contravened due process. *Robinson v.*

*Ariyoshi,* 441 F. Supp. 559 (Hawaii 1977). It therefore enjoined the enforcement of parts of the decision it found "untenable and void", *id.* at 586, and returned other portions to a state circuit court for further determination. The State of Hawaii, defendants in the action, then appealed to the Ninth Circuit whence these questions emanated.

## THE COURSE OF LITIGATION

In 1959 McBryde Sugar Company filed a state court action seeking a determination of rights in and to the waters of the Hanapepe River[1] on the island of Kauai, naming Gay & Robinson, Olokele Sugar Company, the State of Hawaii and private owners of small parcels within the ahupuaa of Hanapepe as defendants. Each of the parties owned or utilized parcels of land from which rights and interests in the waters of the Hanapepe could be claimed.

The trial court, after considering extensive argument and evidence, issued a decision awarding quantities of water pursuant to what the court determined to be the parties' appurtenant,[2] prescriptive[3] and surplus[4] water rights. Appeals were filed therefrom to this court by McBryde, Gay & Robinson and the State, each alleging that the trial court had erred in identifying or quantifying the nature or extent of its rights.

We reversed the trial court in part, for after scrutinizing the foundation and extent of the water rights asserted by the parties, we concluded that the only enforceable private usufructory interests in the waters of the Hanapepe were appurtenant and riparian rights and that the State was the owner of the river's waters. We further ruled that water withdrawn pursuant to either of these private rights

---

[1] The term "Hanapepe River" includes the Koula and Manuahi Streams which join to make the Hanapepe.

[2] Appurtenant water rights are rights to the use of the quantity of water utilized by parcels of land at the time of its original conversion into fee simple. Peck v. Bailey, 8 Haw. 658 (1867).

[3] "Prescriptive water rights" were thought to be rights acquired by adverse possession.

[4] "Surplus water" represented that amount which remain in a watercourse after the rights of others had been satisfied. *See* question 6, *infra.*

could only be utilized on the lands to which the right appertained. We therefore reversed the trial court's award of prescriptive rights and surplus water, and delineated the scope of the remaining private interests.

The private parties subsequently petitioned for a rehearing, averring, *inter alia,* that the decision constituted a "taking" of vested property rights. A rehearing was granted, but after oral argument the original opinion was affirmed. The private parties thereafter sought a review of the decision by the United States Supreme Court which summarily denied the request.[5]

Prior to the denial of review by the Supreme Court, the private parties[6] in *McBryde* initiated the underlying suit in the United States District Court for the District of Hawaii, seeking declaratory and injunctive relief from those parts of *McBryde* relating to the State ownership of water, the transferability of private water entitlements, and the doctrine of riparianism expounded therein. They essentially maintained that our rulings thereon resulted in a "taking" of vested property rights.[7] The district court, though purporting to recognize that "[i]t is axiomatic that the law of real property is left to the states to develop and administer[,]" 441 F. Supp. at 584, granted the requested relief. Relying principally upon Justice Stewart's concurring opinion in *Hughes v. Washington,* 389 U.S. 290, 294 (1967), where he posited that a "sudden" and "unpredictable" change in state property law converting what had been established as private property into public property constitutes a "taking," the district court found the questioned portions of *McBryde* represented an unjustifiable departure from prior law that took private property for the State.

Upon appeal of the decision to the Ninth Circuit, the following questions were certified to this court regarding the effect to be given

---

[5] The Supreme Court denied review under both its certiorari and appellate jurisdiction. McBryde Sugar Co. v. Hawaii, 417 U.S. 962 (1974).

[6] The suit was initially filed by Robinson designating the State and other private parties as defendants. All private parties however concurred with Robinson and were treated as plaintiffs by the federal district court.

[7] Procedural due process violations were also alleged. The district court appeared to concur with the allegations but did not rest its judgment on that ground. Robinson v. Ariyoshi, *supra,* 441 F. Supp. at 580.

*McBryde* in the courts of this state, the effect to be given a previous case involving the water rights of Gay & Robinson and the State, *Territory v. Gay,* 31 Haw. 376 (1930), *aff'd* 52 F.2d 356 (9th Cir. 1931), *cert. denied,* 284 U.S. 677 (1931), and the status of surplus water law under Hawaii law prior to *McBryde.*

### THE CERTIFIED QUESTIONS

The questions certified for reply are:

(1) May any Hawaii state official execute on the judgment entered in *McBryde Sugar Co. v. Robinson, supra,* to enjoin Robinson, McBryde, Olokele, or the Small Owners from diverting water from the Hanapepe or Koula watersheds?

(2) May the State of Hawaii claim collateral estoppel or bar and merger effect from *McBryde Sugar Co. v. Robinson, supra,* if the state brings an action either to quiet title to the water of the Hanapepe or to enjoin the diversion of water from the Hanapepe?

(3) Do the rulings in *McBryde,* with respect to water ownership and water diversion have binding precedential effect on the Hawaii state courts?

(4) Does *Territory v. Gay,* 31 Haw. 376 (1930) (Gay II), *aff'd,* 52 F.2d 356 (9th Cir.), *cert. denied,* 284 U.S. 677 (1931), preclude the State of Hawaii from bringing an action against Robinson, Olokele, McBryde, or the Small Owners to enjoin them from diverting water from the Koula or Hanapepe watersheds?

(5) Does *McBryde, supra,* preclude any or all of the appellees from bringing an action in state court alleging that their property was taken without compensation in violation of the Fifth Amendment to the United States Constitution?

(6) Until *McBryde, supra,* was decided, had the issue of who owned surplus water been a settled question in Hawaii law?

QUESTION 1: May any Hawaii state official execute on the judgment entered in *McBryde Sugar Co. v. Robinson, supra,* to enjoin Robinson, McBryde, Olokele, or the Small Owners from diverting water from the Hanapepe or Koula watersheds?

The jurisdiction of our courts to determine water rights in *McBryde* was found in Part III of Chapter 234, R.L.H. 1955. Section 234-33 thereof sets forth the permissible nature and scope of a

judgment by a state court in cases involving water rights. It provides in relevant part that the court

> shall give such decision as may in each particular case appear to be in conformity with vested rights and *shall be just and equitable between the parties.* [I]f on a water right [the decision] *shall state* the proportion of time for use, *and any other things necessary to the right.* It may also regulate the methods by which water may be obtained, and by which its supply can be controlled. (Emphasis added).

Thus under this statute, it is the prerogative and duty of a court not merely to apportion the waters of a watercourse but to define the scope of identified rights and insure the equitability of the effect of its determinations.

The trial court in *McBryde* did little more than identify the respective quantities of water to which each party was entitled by virtue of its reputed appurtenant, prescriptive or surplus water rights. However, the pertinent statute empowered the court to further delineate the scope of the water rights identified. The supreme court in its opinion exercised this statutorily granted prerogative regarding the transport of water.

Thus in *McBryde* we held that

> the *right* to the use of water acquired as appurtenant rights may only be used in connection with that particular parcel of land to which the right is appurtenant . . . .

54 Haw. at 191, 504 P.2d at 1341, and that a "riparian right appertains only to land adjoining a natural watercourse for its use." 54 Haw. at 198, 504 P.2d at 1344. But we did not actually enjoin or explicitly prohibit the diversion of water from the watershed. Rather, we sought only to establish that these private usufructory interests were not so broad as to include any inherent enforceable right to transmit water beyond the lands to which such private interests appertained.

We did not say that such transfers are prohibited as a matter of law, for *McBryde* did not discuss and therefore cannot be understood to be conclusive of the circumstances under which a private party or the State could obtain injunctive relief against unsanctioned transfers. And, even in circumstances where some relief would be appropriate, the issuance of any injunction would of course be subject to all

of the considerations that serve to limit equitable relief. These limiting doctrines include estoppel, laches, and most particularly with respect to wrongful diversion of water, the public use doctrine as applied to our own unique situation. *See, Reppun v. Board of Water Supply*, 65 Haw. 531, 656 P.2d 57 (1982).

Thus we take issue with the federal district court's characterization of *McBryde* as "restraining the free diversion of surface waters for use outside the lands of the plaintiffs to which they are appurtenant." *Robinson v. Ariyoshi, supra,* 441 F. Supp. at 586. *McBryde* merely established that there was no *right* on the part of the plaintiffs to benefit from such diversions. But, as was the case in our pre-existing law governing the transport of water,[8] diversions will be restrained only after a careful assessment of the interests and circumstances involved indicates a need for restraint. A delineation of these interests and circumstances were not before us in *McBryde* and we did not order the cessation of any diversions. Consistently with our

---

[8] Hawaii's law governing the transfer of water prior to *McBryde, supra,* did not provide private possessors of water rights with an absolute right to transfer water away from the land to which that right appertained. Rather, a change in any aspect of the utilization of a private water right has always been understood as dependent upon such a change not injuriously affecting the rights of others. This rule applied not only to the location to which the water was applied, Peck v. Bailey, 8 Haw. 658, 673 (1867), and use to which the water was put, *id.,* but also to any change in the point of a diversion, Carter v. Territory, 24 Haw. 47, 69 (1917), or method by which water was diverted, *id.*

The rights of others which were to be respected were not limited simply to a specified quantity of water. Instead, the scope and nature of such rights also included interests in the means of any diversion and the purposes to which the water was applied. *See, e.g.,* Kahookiekie v. Keanini, 8 Haw. 310 (1891) (diversion of spring enjoined even if landowner were entitled to specified quantity of water because reduction in stream flow would affect the condition of a lower auwai). Any alteration in the use of a water right was therefore wholly dependent upon the surrounding circumstances.

The burden of demonstrating that any transfer of water was not injurious to the rights of others rested wholly upon those seeking the transfer. Hawaiian Commercial & Sugar Co. v. Wailuku Sugar Co., 15 Haw. 675, 694 (1904). Thus, in order to obtain any ultimate judicial sanction to a transfer of water away from the lands of ancient application, a holder of a water right would have to 1) have defined all the potentially affected interests in a watercourse, and 2) have demonstrated that no aspect of these rights would be detrimentally affected. As long as there remained undefined or potentially affected interests in a watercourse no transfer of water could therefore be secure. It is therefore difficult to speak of there having existed an enforceable right to transfer water from the lands to which water rights attached.

statutory prerogative, we merely defined the appropriate scope of the rights established in the case and left the actual enforcement of these limitations to appropriate subsequent actions brought by the parties, including the State.

QUESTION 2: May the State of Hawaii claim collateral estoppel or bar and merger effect from *McBryde Sugar Co. v. Robinson, supra,* if the state brings an action either to quiet title to the water of the Hanapepe or to enjoin the diversion of water from the Hanapepe?

## I.

We initially consider the question of the preclusive effect of *McBryde* should the State bring an action to quiet title to the waters of the Hanapepe. We think the answer here is simple: under our correlative system of water rights, an action to quiet title is not an appropriate means to adjudicate controversies over the corpus of the water itself.

Our quiet title statute provides:

Action may be brought by any person against another person who claims, or who may claim adversely to the plaintiff, an *estate or interest in real property,* for the purpose of determining the adverse claim.

HRS § 669-1(a) (1976) (emphasis added). It has essentially remained in its original form since its enactment in 1890, L. 1890 ch. 18, when its purpose was stated as follows:

The main object of the Bill is the determination of shares in real property, and the rights of the petitioner, and granting authority to one who possesses a right in certain property which is in dispute, to petition the Court . . . to hear said petitions, . . . as there is no law which clearly defines petitions of this nature in force at the present time . . . .

Rept. No. 110, Committee on Judiciary, Legislative Assembly (1890). *Accord: Pacific Trust Co. v. Nagamori,* 32 Haw. 323, 331 (1932) ("The statutory action to quiet title was intended as one means of establishing and declaring the interests of the parties in the same land.") Since such enactment, we have never sanctioned a use of the statute to quiet title to water per se, though it may be used to quiet title to real property with appurtenant or riparian water rights.

Absent legislative charge, we will continue to adhere to the fore-going view.

## II.

We turn now to the issue of the preclusive effect of *McBryde* in an action by the State to enjoin the diversion of water from the Hana-pepe.

By and large, we have applied traditional notions of res judicata when confronted with questions regarding the degree to which a prior judgment should be binding in a subsequent action. We have thereby sought to achieve the traditional objectives of that principle, *i.e.:*

> The public interest staunchly permits every litigant to have an opportunity to try his case on the merits; but it also requires that he be limited to one such opportunity. Furthermore, public reliance upon judicial pronouncements requires that what has been finally determined by competent tribunals shall be accepted as undeniable legal truth. Its legal efficacy is not to be under-mined.

*Ellis v. Crockett*, 51 Haw. 45, 56, 451 P.2d 814, 822 (1969). The objectives of res judicata and the framework used to attain these aims apply to water rights controversies just as they do to other actions. And we have not hesitated to apply principles of res judicata to water actions very similar to *McBryde. See, e.g.,* Palolo Land and Improvement Co. v. Wong Quai, 15 Haw. 554 (1904); *Hawaiian Commercial & Sugar Co. v. Wailuku Sugar Co.,* 14 Haw. 50 (1902); and *Un Wo Sang Co. v. Alo,* 7 Haw. 661 (1889).

However, *McBryde* in its current posture has no bar and merger effect, and issue preclusion would be confined to the quantification of appurtenant water rights. For the record does not reflect any final judgment in the case, as

> [f]inality [for bar and merger purposes] will be lacking if an issue of law or fact essential to the adjudication of the claim has been reserved for future determination, or . . . the amount of dam-ages, or the form or scope of other relief, remains to be deter-mined.

*Restatement (Second) of Judgments,* § 13 comment b (1982).

*McBryde* began and was treated throughout by the trial court as

an action to determine the rights of the parties to the waters of the Hanapepe. The trial court's judgment identified the quantity of water each party was entitled to by virtue of its ostensible appurtenant, prescriptive and surplus water rights. This delineation apparently was an exhaustive division of all of the river's waters. On appeal this court affirmed in part the award of appurtenant water rights and reversed the trial court's award of prescriptive and surplus waters. We also confirmed the existence of riparian rights, delineated limitations on the right to transport appurtenant and riparian waters, and found that the State was the owner of surplus water. But no specific instruction was imparted to the trial court, and this court did not utilize its power to render a final judgment. Our judgment on appeal only provided that the trial court's judgment was "affirmed in part; reversed in part." 54 Haw. at 200, 504 P.2d at 1346.

A simple reversal of part of a judgment without further instruction renders that part void, as if it had never been entered. *See O'Brien v. Great Northern R. Co.,* 148 Mont. 429, 421 P.2d 710 (1966), *cert. denied,* 387 U.S. 920 (1966); *Bock v. Bock,* 311 So.2d 684 (Fla. 1975). Since the appellate reversal provided no instruction to the contrary, the *McBryde* judgment after appeal was only a partial quantification of the parties' appurtenant water rights. No other final determination with res judicata effect remained. *Cf. Int'l Telephone and Telegraph Corp. v. General Telephone and Electronics Corp.,* 527 F.2d 1162 (4th Cir. 1976) (final judgment lacking after partial reversal which necessitated further action).

This, of course, is not to say that the determination of rights rendered in the court's judgment was without effect. Upon continuation of the case at the trial level such determination would constitute the "law of the case" and would serve as the foundation for any further action.[9] But it would not necessarily be completely

---

[9] *See* Glover v. Fong, 42 Haw. 560, 578 (1958):

The doctrine of the law of the case is akin to res judicata but is more limited in its application. It relates solely to questions of law and is confined in its operation to subsequent proceedings in the same case. [Citation omitted.] The doctrine is that a determination of a question of law made by an appellate court in the course of an action becomes "the law of the case" and may not be disputed by a reopening of the question at a later stage of the litigation. It normally commands adherence but is not subject to the inflexibility of res judicata.

dispositive of such an action. For *McBryde* necessarily left unresolved factual and legal issues that would require a determination by a trial court prior to any final judgment respecting the distribution of the waters of the Hanapepe. These include the identification of riparian lands to which such rights attach and most significantly the nature and scope of any remedies to be afforded the parties. Unless and until such findings and conclusions are made and the process finally concluded, *McBryde* can have no res judicata effect except as to that part of the judgment which was not disturbed on appeal.

QUESTION 3: Do the rulings in *McBryde*, with respect to water ownership and water diversion have binding precedential effect on the Hawaii state courts?

Just as we are in agreement with the general principles of res judicata, so do we concur in the application of stare decisis:

"Under the rule of *stare decisis*, where a principle has been passed upon by the court of last resort, it is the duty of all inferior tribunals to adhere to the decision, without regard to their views as to its propriety, until the decision has been reversed or overruled by the court of last resort or altered by legislative enactment." [Citation omitted].

*Kapiolani Estate v. Atcherley*, 21 Haw. 441, 454 (1913). *Accord: The King v. Robertson*, 6 Haw. 718, 725 (1889) ("The law of this country is found in our enacted statutes, and in the precedents established by decisions of our Supreme Court . . . ."); *Estate of Allen*, 35 Haw. 501, 515 (1940); and *Kamau & Cushnie v. County of Hawaii*, 41 Haw. 527, 550 (1957) (" '*Stare decisis* is primarily a doctrine by which a Supreme Court keeps the other courts of a judicial system in line . . . . [citation omitted]' "[10]

---

[10] We also recognize that stare decisis acts not just to require obedience by inferior tribunals to the decisions of superior courts, but also as a principle of self-restraint on courts with respect to the overruling of prior decisions. We apply stare decisis in this respect with a view toward

the desirability that the law furnish a clear guide for the conduct of individuals, to enable them to plan their affairs with assurance against untoward surprise; the importance of furthering fair and expeditious adjudication by eliminating the need to relitigate every relevant proposition in every case; and the necessity of maintaining public faith in the judiciary as a source of impersonal and reasoned judgments.

Moragne v. States Marine Lines, Inc., 398 U.S. 375, 403 (1970). Yet, we have also concurred with Mr. Justice Frankfurter, writing for the Court in Helvering v. Hal-

We have also noted that an inferior tribunal might not be bound under the doctrine of stare decisis if the pronouncement of a superior court is actually dictum. *In re Sherretz,* 39 Haw. 431, 437 (1952).[11] But much earlier, we questioned the wisdom of a rule that accords a statement of a superior court no precedential weight merely because the statement was not necessary to the actual adjudication of the controversy:

> But perhaps as important a question as that of whether an opinion is a decision or a *dictum* is that of the weight to be given to it if it is a *dictum.* To hold that an opinion is a *dictum* is not equivalent to holding either that the court in the particular case acted unwisely in giving it or that no respect should be shown it. There are all shades. Even an actual decision may be reversed if clearly erroneous. An opinion expressed after full argument and due consideration upon a doubtful point closely connected with, or apparently though not necessarily involved in a case, should perhaps, on principle, be given greater weight than an actual decision rendered upon little argument and consideration. It should at least be given greater weight than an opinion expressed merely by the way. . . . There is no doubt a greater tendency now than there was formerly to pass upon questions presented but not necessary to be decided, and doubtless courts often go too far

---

lock, 309 U.S. 106, 119 (1940), that *"stare decisis* is a principle of policy and not a mechanical formula of adherence to the latest decision, however recent and questionable . . . ." McBryde Sugar Co. v. Robinson, *supra,* 54 Haw. at 180, 504 P.2d at 1335 (1973). Thus, we have stated:

> This court, like the United States Supreme Court, has "rejected a doctrine of disability at self-correction." *Helvering v. Hallock, supra* at 121. We believe that the doctrine of stare decisis is subordinate to legal reasons and justice and we should not be unduly hesitant to overrule a former decision when to do so would bring about what is considered manifest justice. [Footnote omitted.] In other words, there is no necessity or sound legal reason to perpetuate an error under the doctrine of state decisis. Of course, on the other hand, we should not change a case law just for the sake of a change.

*Id.*

[11] "It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision." [Citations omitted.]

Osaka Shosen Kaisha Line v. United States, 300 U.S. 98, 103 (1937).

in that direction. Just how far they should go in any particular case depends largely upon the circumstances of that case. . . . Perhaps the strongest reason that can be urged in support of the course pursued [here] is, that the case was to go back to the Circuit Court for further action and that that court would naturally want instructions upon the point in question and that, if such instructions were not given, the case would probably be brought to this court again for the settlement of the question. Under such circumstances, with a view to settling the law of the case once for all, the court would often be justified in going further than it would under some other circumstances.

*Nobrega v. Nobrega,* 14 Haw. 152, 153-54 (1902). Thus, we think a more constructive approach would be to consider a statement of a superior court binding on inferior tribunals, even though technically dictum, where it "was passed upon by the court with as great care and deliberation as if it had been necessary to decide it, was closely connected with the question upon which the case was decided, and the opinion was expressed with a view to settling a question that would in all probability have to be decided before the litigation was ended." *Id.* at 155.[12]

Having expressed these views, we turn to the particular question propounded for our response. We conclude that the doctrine of stare decisis will generally apply with respect to the effect to be given *McBryde* by the courts of this jurisdiction. Thus, all conclusions in that case necessary to adjudicate the controversy are binding on state courts. We do not reach the question of whether such conclusions include those respecting water ownership and diversion; we think it clear that even if this were not the case, those decisions should, under the test we set forth in the preceding paragraph, be accorded binding precedential effect.

In sum, we answer question 3 affirmatively. The rulings in *McBryde* with respect to water ownership and water diversion have binding effect in the state courts of Hawaii.

---

[12] *Cf.* United States v. Kahn, 251 F. Supp. 702, 708 (S.D.N.Y. 1966), *aff'd,* 366 F.2d 259 (2nd Cir. 1966), *cert. denied,* 385 U.S. 948 (1966) (where there is no other authority on point, a district court is obliged to follow a pronouncement of the Supreme Court, even though it is a dictum).

QUESTION 4: Does *Territory v. Gay,* 31 Haw. 376 (1930) (Gay II), *aff'd* 52 F.2d 356 (9th Cir.), *cert. denied,* 284 U.S. 677 (1931), preclude the State of Hawaii from bringing an action against Robinson, Olokele, McBryde, or the Small Owners, to enjoin them from diverting water from the Koula or Hanapepe watersheds?

*Gay II* was a suit in equity brought in 1928 by the Territory of Hawaii, the owner of the ahupuaa of Hanapepe, against Gay & Robinson, the owner of the independent ilis kupono of Koula and Manuahi which are located entirely within the ahupuaa of Hanapepe, and Hawaiian Sugar Co., Ltd., a lessee of Gay & Robinson.

Pursuant to a lease agreement with Gay & Robinson, Hawaiian Sugar diverted waters originating in Koula from the Koula-Manuahi-Hanapepe watershed for use elsewhere. The waters would otherwise have flowed out of Koula and Manuahi and have been available for downstream use by the Territory.

The Territory wanted the use of this water and filed a bill in equity, asserting ownership of all "surplus" waters arising in the ahupuaa of Hanapepe, including such "surplus" waters as originated on the upstream lands of Gay & Robinson. It prayed for "an injunction restraining . . . [Gay & Robinson and Hawaiian Sugar] from illegally diverting water from said Hanapepe River . . . [a]nd for such other and further relief . . . [as might be appropriate]." Gay & Robinson's response was that it owned the "surplus" waters originating in Koula and Manuahi and was thus free to allow Hawaiian Sugar's diversion thereof.

In its decree, the trial court first noted it had "consented to hear this cause on the condition that the issue be confined to the sole question of title to the normal daily surplus of waters arising and flowing in . . . [that portion of the ahupuaa of Hanapepe consisting of Gay & Robinson's ilis kupono of Koula and Manuahi]." Later in the decree it reiterated the foregoing by stating: "The only question which this Court will attempt to decide is the right of the respondents to continue to maintain the diversion of a part or *all* of the normal daily surplus of waters arising . . . [in Koula and Manuahi]." Its conclusion was:

> This Court, therefore, holds that the respondents at bar are legally entitled, by reason of their fee simple ownership of the sources of the water supply arising in the ilis of Manuahi and

Koula, to divert and use as their own, all the normal, daily surplus of waters of the Koula Stream, so long as this diversion under that claim of ownership does not interfere with the established prescriptive rights of lower landowners in Hanapepe Valley for domestic uses and for wet agricultural use.

Therefore the injunctive remedy sought by the Territory was denied.

· The Territory appealed the decision, and our predecessors affirmed the trial court, apparently on the primary basis that owners of ilis kupono, not encompassing ahupuaas, were entitled to normal daily surplus waters arising in the ilis.

In considering the scope of *Gay II*'s res judicata effect, we first note we have not approved the application of the doctrine of merger and bar by a non-party to a prior action against a party thereto, though we have sanctioned the defensive use of collateral estoppel by a non-party. Thus, the non-parties to *Gay II*, including Olokele, McBryde and the small owners (assuming none was in privity with the *Gay II* parties), could not argue claim preclusion against the State in a state action to enjoin the diversion of water from the Koula or Hanapepe watersheds.

Second and more importantly, we do not view the action in *Gay II* as one to enjoin a wrongful diversion of water *out of* the Manuahi-Koula-Hanapepe watershed. Rather, the record is clear that the Territory sought to enjoin an allegedly illegal and injurious diminution in streamflow. The case was not concerned with the propriety of extra-watershed transfers; that the court's decree had an effect of stopping such diversions was only incidental to the primary subject matter of the suit. Thus, even as between the parties to *Gay II*, no claim preclusion will arise from that adjudication to prevent a state action to enjoin such extra-watershed transfers.

Thus, we answer the question primarily in the negative: *Gay II* will not have merger and bar effect against the State in a subsequent suit to enjoin the diversion of water from the Koula or Hanapepe watersheds (a) except as between the parties to *Gay II* or their privies, and (b) even as between them, because such a claim would be different from the claim in *Gay II*. Although collateral estoppel may bar some claims, we do not think it necessary to discuss the full scope of its effect now.

QUESTION 5: Does *McBryde, supra,* preclude any or all

appellees from bringing an action in state court alleging that their property was taken without compensation in violation of the Fifth Amendment of the United States Constitution?

We are assuming the action referred to would be similar to the one brought in *Robinson* which alleged that enforcement of significant portions of the *McBryde* decision should be enjoined and parts of the opinion declared a "nullity" on grounds that the decision took" vested property.

State judicial action may, of course, constitute state action violative of the Fourteenth Amendment of the United States Constitution. *Shelley v. Kraemer*, 334 U.S. 1 (1948). Inasmuch as the Fifth Amendment limitation on governmental takings has been extended to the states via the Fourteenth Amendment, a judicial determination could arguably constitute a taking of private property without just compensation. *Hughes v. Washington*, 389 U.S. 290, 294 (1967) (Stewart, J., concurring). The issue we now address is whether or in what circumstances a purported judicial taking by way of a decision of our state supreme court can serve as a basis for subsequent action in our state courts.[13]

## I.

Due process in its "primary sense" presupposes that one claiming to be injured by violations of the law will be permitted "an opportunity to present its case and be heard in its support." *Brinkerhoff-Faris Trust & Savings Co. v. Hill*, 281 U.S. 673 (1930). Thus if persons allegedly wronged by unconstitutional state action are wholly without an effective avenue of recourse, the availability of some forum would be required, notwithstanding any state court determinations on the applicable scope of any doctrine of preclusion. *Postal Tele-*

---

[13] Appellees also raise the issue of sovereign immunity. The State may, of course, only be sued pursuant to a waiver of its immunity. Big Island Small Ranchers Ass'n v. State, 60 Haw. 228, 588 P.2d 430 (1978). And we agree with Appellees that our applicable statutes contain no provision for a suit against the State seeking damages based on any "taking" resulting from the *McBryde* opinion. But "sovereign immunity may not be invoked as a defense by state officials who comprise an executive department of the government when their action is attacked as being unconstitutional." W. H. Greenwell, Ltd. v. Land Dept., 50 Haw. 207, 209, 436 P.2d 527, 528 (1968). Hence a suit in state court similar to that filed in Robinson v. Ariyoshi, *supra*, seeking to enjoin an unconstitutional application of *McBryde* by state officials would not be precluded by the doctrine of sovereign immunity.

*graph Cable Co. v. Newport*, 247 U.S. 464 (1918). But assuming that an adequate opportunity to be heard is provided, such limitations within our state system are wholly a function of state law, *id.* since there is no constitutional obligation to "afford a litigant more than one full and fair opportunity to judicial resolution of the same issue." *Blonder-Tongue v. University Foundation*, 402 U.S. 313, 328 (1971).

Appellees have argued that a subsequent action based on *McBryde* should not be precluded because they had no opportunity to litigate the issue of whether determinations in the opinion constituted a taking. Conversely, the State contends that this issue was actually litigated and decided as part of the appeals process, specifically during the rehearings process before our state supreme court and in Appellees' appeals and petitions for certiorari addressed to the United States Supreme Court. We therefore begin with an inquiry on whether the aforementioned appeals processes afforded Appellees an adequate opportunity to argue the issues which would be raised in a second action.

In the *McBryde* appeal, a rehearing was granted by this court pursuant to timely petitions, motions, and memoranda filed by McBryde, Gay and Robinson, Olokele and the small owners. Among the grounds asserted and discussed were allegations that the court's original opinion violated the petitioners' rights under the federal constitution, including the takings clause of the Fifth Amendment.[14]

---

[14] The federal constitutional arguments raised in the petitions for rehearing are summarized in McBryde and Olokele's writ of certiorari before the United States Supreme Court as follows:

SUBSEQUENT PROCEEDINGS AND REHEARING

Timely petitions for rehearing were filed by McBryde and by Gay & Robinson. A "Motion for Partial Vacation of Opinion and for Opportunity to Present Evidence and Argument" was filed by Olokele, its first active appearance in the appeal. The two petitions and the motion contended *inter alia that the court's application of Hawaii Rev. Stat. § 7-1 and the 1847 enactment was unconstitutional since, as construed, they took vested property rights without compensation*, and because the court had construed and applied those provisions without observance of the requirements of procedural due process. Gay & Robinson, a party to the decision in *Territory v. Gay*, and Olokele, whose predecessor in interest was a party in that action, and who, as lessee of Gay & Robinson, is in privity with a party to that action, maintained that the two provisions had been applied in violation of the doctrine of *res judicata*. Olokele specifically claimed that the "doctrine of res judicata . . . is an aspect of [the] basic guaranty of the Due Process Clause." Gay &

The petition for rehearing was subsequently granted with further briefing being requested on the interpretation of HRS § 7-1 and the transfer of appurtenant water rights.[15] On September 18, 1973, oral argument was heard pursuant to the petition, with each party permitted one-half hour for argument. While no transcription of the argument was made, the minutes of the court clerk reflect that the takings issue was discussed.[16] The court then considered the arguments presented and affirmed the original *McBryde* judgment in a per curiam opinion. Justice Levinson in his dissenting opinion discussed Appellee's takings argument at length and relied on it as one of the grounds for his dissent.[17] The parties thereafter filed appeals or petitions for certiorari in the United States Supreme Court. The Supreme Court denied the requests for review. 417 U.S. 962 (1974).

We agree with the State that these opportunities to present arguments and to potentially prevail in the foregoing judicial proceedings were sufficient to insure Appellees their day in court. Preclusion of further consideration of the takings question arising from the *McBryde* judgment would be neither unfair nor violative of due process.

The rehearings process in this court, of which Appellees availed themselves, provides the parties with an opportunity to challenge errors in the formulation of the court's initial decision in a case. *Godbold v. Manibog,* 36 Haw. 230 (1942). Our rules provide parties

---

Robinson also argued that the court's application of its holdings to a party to *Territory v. Gay,* 52 F.2d 356 (1931), *certiorari denied,* 284 U.S. 677 (1931), failed to afford Full Faith and Credit to the Ninth Circuit's decision in that action.

(Footnotes omitted; emphasis added). Writ of certiorari at 13-15.

[15] While the briefs on rehearing were limited to these issues, oral argument was not. Moreover, inasmuch as the parties asserted that the interpretation of HRS § 7-1 adopted in the *McBryde* opinion constituted a taking of vested rights, the takings issue could have been and was raised as part of the briefings process. See Supplemental Brief of Small Owners at 23.

[16] Mr. Quinn opened the argument for Olekele [sic] Sugar Co., Ltd. He presented argument on the issues of res judicata and the utilization of the water. He also argued that if an individual [sic] rights are violated the individual should be compensated. He concluded at 10:30 a.m.

[17] 55 Haw. at 298-304, 517 P.2d at 47-50. Justice Levinson joined the majority in the initial *McBryde* opinion. However, after the rehearing he "recant[ed] that position" pursuant to, among other things, "arguments adduced on rehearing". *Id.,* 55 Haw. at 262, 517 P.2d at 27.

with a right to petition for rehearing and requires the stating of the grounds therefor.[18] By this process the court's attention is focused on any alleged infraction, and the decision is reviewed in this light. If the petition is granted, oral argument may be permitted and the earlier opinion may be amended. The petitioners are therefore provided with an opportunity to prevail on the merits of their argument.

Even if the petition for rehearing is denied, the opinions of the United States Supreme Court assure the availability of that body as yet another forum for judicial consideration. For it is a longstanding rule of that court that a federal claim first raised by petition for rehearing in a state court is in time for purposes of review if the occasion for it arose unexpectedly from the grounds of the state court's decision. *Brinkerhoff-Faris Trust, supra; Great Northern Railway Co. v. Sunburst Oil and Refining Co.,* 287 U.S. 358 (1932); *Herndon v. Georgia,* 295 U.S. 441 (1935). Thus, the arising of a takings issue upon the Hawaii supreme court's initial determination of the *Mc-Bryde* case did not preclude United States Supreme Court review. The choice of the Supreme Court to make available this arena of review is a recognition that the rehearings process available in a state supreme court is a proper means to raise constitutional issues born of that court's determinations and the decision on rehearing represents a final and binding determination by the state court system on the issue raised.

We conclude that the availability of the rehearings process and United States Supreme Court review of constitutional violations allegedly created by a state supreme court decision provides ag-

---

[18] Supreme Court Rule 5, as in effect at the time of the *McBryde* petitions, provided as follows:

RULE 5. REHEARING

(a) *Time and Form.* A petition for rehearing may be presented only within 10 days after the filing of the opinion or ruling unless by special leave additional time is granted during such period by a justice. The petition shall briefly and distinctly state its grounds and shall include points and authorities relied on in support thereof and shall also be supported by a certificate of counsel to the effect that it is presented in good faith and not for delay.

(b) *Argument; Reply; Allowance.* No reply to a petition for rehearing will be received unless requested by the court or by a justice who concurred in the opinion or ruling and no petition for rehearing will be granted in the absence of such a request. There shall be no oral argument on a petition for rehearing.

grieved persons with adequate opportunity to have their arguments considered and to prevail on the merits when justified. For while neither forum provides an opportunity for a full trial, consideration of the strength and validity of the arguments are afforded at each level. Requiring the availability of yet another forum would mean that the parties are entitled to two independent opportunities for judicial relief. We perceive no reason to provide them with two complete bites of the apple.

## II.

We now turn to the question of whether an independent action would be precluded under the laws of our state.

Except as provided by statute, the jurisdiction of our circuit courts is strictly original. HRS § 603-21.8, 603-21.9 (1976). And of course, these courts are endowed with no statutory authority to review the decisions of our state supreme court. Thus, if a takings action based on the *McBryde* opinion constitutes an appeal of that opinion, the circuit courts would be without jurisdiction to entertain the suit.

A similar limitation is imposed on the jurisdiction of the federal district courts by *Rooker v. Fidelity Trust*, 263 U.S. 413 (1923), where the Supreme Court stated:

If the constitutional questions stated in [an action in federal district court] actually arose in [a previous action in the state courts] it was the province and duty of the state courts to decide them; and their decision, whether right or wrong, was an exercise of jurisdiction. If the decision was wrong, that did not make the judgment void, but merely left it open to reversal or modification in an appropriate and timely appellate proceeding. Unless and until so reversed or modified, it would be an effective and conclusive adjudication. [Citations omitted.] Under the legislation of Congress, no court of the United States other than this Court could entertain a proceeding to reverse or modify the judgment for errors of that character. [Citations omitted.] To do so would be an exercise of appellate jurisdiction. The jurisdiction possessed by the District Courts is strictly original.

*Id.* at 415-16.[19] Thus, under the *Rooker* doctrine there appear to be two relevant inquiries: 1) whether an issue "actually arose" in a previous state court action; and 2) whether a second action is a proceeding to "reverse or modify the judgment." If both inquiries are answered in the affirmative then the second action would constitute a prohibited appeal. The relevant inquiries within our state system would be the same.

As we have seen, the issue of whether the judgment and delineation of rights posited in *McBryde* constituted a taking clearly arose in the process of the *McBryde* appeal.[20] Thus, any suit to "reverse or modify" the judgment based on these takings issues would be an unauthorized appeal. We understand "reverse or modify" to encompass any relief sought to negate or alter the effect of the judgment based on errors allegedly committed during the preceding judicial process.[21]

That our state supreme court is the final arbiter within our state system of constitutional issues arising in or from a particular case is supported by the fact that the United States Supreme Court is authorized to consider and will consider only final judgments in its review and that the takings issue was presented as part of final

---

[19] *See also* Reynolds v. Georgia, 640 F.2d 702 (5th cir. 1981); Buck v. Ohio Court of Appeals, 554 F.2d 766 (6th cir. 1977); Smiley v. South Dakota, 551 F.2d 774 (8th cir. 1977).

[20] *Cf.* Buck v. Ohio Court of Appeals, *supra* (sua sponte reversal of the trial court by the court of appeals based on a statute which both parties agreed was not relevant to the case was not, pursuant to the *Rooker* doctrine, properly the basis for a procedural due process claim in federal district court where plaintiff's due process claims were denied certiorari by the highest court of the state and no attempt was made to appeal the decision to the United States Supreme Court); Smiley v. South Dakota, 415 F. Supp. 870 (D.S.D. 1976), *aff'd*, 551 F.2d 774 (8th cir. 1977) (federal district court, pursuant to *Rooker,* had no jurisdiction to determine whether a trial court's determination of plaintiff's riparian rights constituted a taking when the state supreme court, "fully cognizant of plaintiff's taking claim, affirmed the trial court's decision.")

[21] The precise nature of the relief sought would not be determinative. *Cf.* Paul v. Dade County, 419 F.2d 10, 13 (5th cir. 1969):

[P]resentation to the federal court of the same constitutional questions already passed upon by the state court is a "form of direct federal district court review of state decisions" even though no declaration of the invalidity of the state judgment was sought as in *Rooker.* . . . [T]he district court is patently without jurisdiction to engage in such a review because that review would be tantamount to an attempt "to reverse or modify" a state judgment which *Rooker* proscribes.

judgment before the Supreme Court in the *McBryde* appeal. The Supreme Court has stated the test of finality for the purposes of review is whether the state appeals court "has in fact fully adjudicated rights and that that adjudication *is not subject to further review by a state court." Dept. of Banking v. Pink,* 317 U.S. 264, 268 (1942) (emphasis added). Inasmuch as the Court has entertained and reversed decisions based on constitutional issues that arise from a state supreme court's decision in a case, that is, where the opinion itself is alleged to be violative of the constitution, *see, e.g., Brinkerhoff-Faris Trust, supra,* we can only assume that the Court did not foresee either the necessity or availability of further state court action in the matter.[22]

### III.

We believe the same result would follow if relief were sought through a motion for relief from judgment[23] based on the takings

---

[22] Indeed, Appellees herein, in their original petitions for certiorari before the United States Supreme Court recognized the necessity of the finality of any state judgment brought before that Court and argued accordingly:

> Since the record in this case shows that the judgment of the Hawaii Supreme Court
>> "has in fact fully adjudicated rights and that that adjudication is not subject to further review by a state court"
> (Department of Banking v. Pink, 317 U.S. 264, 268 (1942)) and that it concludes the controversy as to all parties (Meagher v. Minnesota Threshing Mfg. Co., 145 U.S. 608, 611 (1892)), the question of the finality of its decision for purposes of invoking this Court's jurisdiction under Section 1257 is not at issue here. See also Market Street R. Co. v. Railroad Commission, 324 U.S. 548, 551 (1945); Richfield Oil Corp. v. State Board of Equalization, 329 U.S. 69 (1946).

McBryde-Olokele petition for certiorari at 18 n.46.

[23] Hawaii Rules of Civil Procedure 60(b):

> (b) *Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, Etc.* On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable

issue. For while unconstitutional judicial conduct may indeed serve as a basis for relief from judgment under the rule, *cf. Isemoto Contracting Co., Ltd. v. Andrade,* 1 Haw. App. 202, 616 P.2d 1022 (1980) (judgment can be vacated as void pursuant to HRCP 60(b)(4) when proceedings were conducted in such an arbitrary or improper manner that the court's action may be said to constitute a denial of due process) (dicta), we believe a trial court has no jurisdiction under the rule to find that our state supreme court erred in determining issues presented to it.

In *Eutectic Corp. v. Metco Inc.,* 597 F.2d 32 (2nd Cir. 1979), the Court of Appeals for the Second Circuit, confronted with an analogous situation under Federal Rule of Civil Procedure 60(b), reached a similar conclusion. There, appellants sought relief from judgment in federal district court on the basis of "mistakes" allegedly committed by the court of appeals in its previous determination of the case. In affirming the district court's denial of the motion, the court of appeals held that the district court had no jurisdiction under the rule to provide such relief:

> [T]he rule 60(b) motion to correct the "mistake" is addressed . . . to the judgment of the court of appeals. This judgment, however, is without jurisdiction to alter or set aside. The court of appeals' rulings are the law of the case, and the district court is bound to follow them; it has no jurisdiction to alter or review them. [Citations omitted.]
>
> The proper course for appellants to seek review of the court of appeals' alleged mistake was by writ of certiorari to the Supreme Court. . . . The Rule 60 motion cannot be used as a substitute for appeal. [Citation omitted.]

597 F.2d at 34. This apparently is the general rule. 7 MOORE, FEDERAL PRACTICE, 425 (2d ed. 1974).

---

time, and for reasons (1), (2), and (3) not more than one year after the judgment, order or proceeding was entered or taken. A motion under this subdivision (b) does not affect the finality of a judgment or suspend its operation. This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, or to set aside a judgment for fraud upon the court. Writs of coram nobis, coram vobis, audita querela, and bills of review and bills in the nature of a bill of review, are abolished, and the procedure for obtaining any relief from a judgment shall be by motion as prescribed in these rules or by an independent action.

The rule is identical in substance to the federal rule.

*McBryde, supra,* thus precludes the bringing of any action in state court which would constitute an appeal of that case either by way of an original action or a motion for relief from judgment.[24]

## IV.

This, however, does not preclude all original actions relating to Appellees' use of the waters of the Hanapepe. For the preclusive effect of the *McBryde* appeal extends only so far as the issues decided in that case. *Cf. Hicks v. Miranda,* 422 U.S. 332, 345 n.14 (1975) (preclusive effect of Supreme Court dismissal for want of a substantial federal question, while a dismissal on the merits, is limited to issues properly presented and declared to be without merit). And, as we have stated in response to questions 1 and 2, we understand *McBryde* to be silent on the actual application of the rights delineated therein to existing diversions. Thus, we do not understand the opinion to have addressed the question of whether the cessation of any particular diversion would in fact constitute a "taking." An action by Appellees to enjoin the cessation of particular diversions would therefore not be precluded by that decision.

We have not hesitated in other circumstances to prohibit what might be otherwise lawful governmental action in order to prevent

---

[24] Moreover, we are convinced that an action which alleged that all applications of *McBryde* would constitute takings must inevitably fail. For a change in rules of law governing property does not, in itself, provide the basis for an alleged constitutional violation. As stated in Baumann v. Smrha, 145 F. Supp. 617, 625 (D. Kan. 1956), *aff'd per curiam,* 352 U.S. 863 (1963), in which a three-judge district court panel upheld the judicial and statutory abrogation of a pre-existing system of common law water rights,

There is no vested right in the decisions of a court and a change of decision does not deprive one of equal protection of the laws or property without due process of law.

Even though prior decisions of a state court have established a rule of property, a departure therefrom in a subsequent decision does not, without more, constitute a deprivation of property without due process of law under the Fourteenth Amendment.

(Footnotes omitted.) Thus, the fact that *McBryde* departed from the parties' understanding of pre-existing common law and may have extinguished theretofore unexercised usufructory rights under that system does not provide a grounds for a takings action. *Cf.* Village of Tequesta v. Jupiter Inlet, 371 So.2d 663 (Fla. 1971); Knight v. Grimes, 127 N.W.2d 708 (S.D. 1964) (upholding constitutionality of change in common law system of water rights).

"manifest injustice." *Filipo v. Chang,* 62 Haw. 626 (1980) (applying doctrine of equitable estoppel). Whether a similar equitable restraint or the Constitution's prohibition of "taking" vested property interests will preclude the literal application of the rights posited in *McBryde* has yet to be decided.

QUESTION 6: Until *McBryde, supra,* was decided had the question of who owned surplus water been a settled question in Hawaii Law?

It is generally recognized that a simple private ownership model of property is conceptually incompatible with the actualities of natural watercourses. Rather, the variable and transient nature of the resource, as well as the necessity of preserving its purity and flow for others who are entitled to its use and enjoyment have led to water rights being uniformly regarded as usufructory and correlative in nature. See, Malony, Ausness & Morris, A Model Water Code, 81 (1972); Trelease, *Government Ownership and Trusteeship of Water,* 45 Cal. L. Rev. 638, 640 (1957).

A part of Hawaii's caselaw, however, appears to have departed from this model by treating "surplus water" as the property of a private individual.[25] We do not believe the departure represented "settled" law. Instead, as the following review of the relevant caselaw

---

[25] Our reference to "Hawaii's caselaw" governing water is perhaps misleading for the volumes of Hawaii Reports represent four separate political regimes. The first was the period prior to 1893, during which Hawaii was a constitutional monarchy and the justices of the Supreme Court were appointed by the king. In 1893, the monarchy was overthrown and a republican form of government was substituted. During this period, the justices were appointed by that government. In 1897, Hawaii was annexed by the United States and until 1959 was a territory with our judges and justices appointed by the President of the United States with the advice and consent of the United States Senate. In 1959, Hawaii became a state.

The only cases treating "surplus water" as private property are to be found during the territorial period, when the judiciary was not a product of local sovereignty. While the decisions of the territorial courts were unquestionably binding upon the parties before it, we doubt whether those essentially federal courts could be said to have definitively established the common law of what is now a state. So long as the federal government was sovereign its authority to frame the law was unquestionable, but upon our assumption of statehood our own government assumed the whole of that responsibility, absent any explicit federal interest. And it is from our authority as a *state* that our present common law springs:

"[B]ut law in the sense in which courts speak of it today [, the common law,] does not exist without some definite authority behind it. The common law so far as it is enforced in a State whether called common law or not, is not the common law

and its impact demonstrates, Hawaii's law regarding surplus water was at the time of *McBryde* in such a state of flux and confusion that it undoubtedly frustrated those who sought to understand and apply it. The difficulty of insuring an equitable distribution of unevenly flowing waters in the face of competing claims and increasing demands made the delineation and application of a simplistic doctrine of ownership well nigh impossible. *McBryde* was brought to us for decision in this context.

## I.

Prior to 1848 land and its usufructs within the kingdom of Hawaii were the property of the king. In that year, by what has come to be known as the Great Mahele, the concept of private ownership of land was introduced and implemented; land traditionally controlled by the king and lesser royalty was granted to them in fee simple upon the satisfaction of certain minimal requirements. Subsequently, commoners and foreigners were granted the right to obtain land in fee. *See generally* Chinen, *The Great Mahele: Hawaii's Land Division of 1848* (1958). Between the time of the Mahele and the turn of the century the courts of the kingdom began to recognize that certain usufructory water rights were also conveyed by the sovereign when lands were transferred into private hands. The principal such interest was an "appurtenant" right to the amount of water utilized on the land at the time of the Mahele. *Peck v. Bailey,* 8

---

generally but the law of that State existing by the authority of that State without regard to what it may have been in England or anywhere else. . . . [T]he authority and only authority is the State, and if that be so, the voice adopted by the State as its own . . . should utter the last word."
*Erie R. Co. v. Tompkins,* 304 U.S. 64, 79 (1938).

The only statement of our law governing surplus water since statehood is to be found in *McBryde.*

We recognize that HRS § 1-1, which was enacted during the monarchy in 1892 and amended only once, in 1903, might be construed to adopt territorial caselaw as among the "Hawaiian judicial precedent" representing the common law of the State. We do not at this time, however, address the question of whether those cases can truly be considered "Hawaiian" rather than federal precedent for we wish only to point out that the development of the law governing surplus water took place during a period when the resources of our land were subject to an authority which did not directly represent Hawaii's people and that the most recent pronouncements on the subject arise more immediately from the authority of those who will be forever affected by it.

Haw. 658 (1867). Also the subject of judicial determinations were so called "prescriptive" rights ostensibly obtained through adverse use of waters for the statutory period of adverse possession necessary for their establishment. *Lonoaea v. Wailuku Sugar Co.*, 9 Haw. 651 (1895). But during the period of Hawaii's independence there was no judicial examination of the rights to the remainder of a natural watercourse after the satisfaction of these usufructory rights.

Thus, in 1902 the Territorial Supreme Court in *Hawaiian Commercial and Sugar Co. v. Wailuku Sugar Co.*, 14 Haw. 50 (1902), stated the question of rights to such "surplus" had "always [been] recognized as one of great difficulty, and the court has carefully avoided passing upon it until compelled to do so and has always regarded it as an unsettled question." *Id.* at 63. Two years later however, the court appeared to say that surplus waters were, by virtue of Hawaiian tradition, the "property" of the konohiki[26] of the ahupuaa of its origin.[27] *Hawaiian Commercial and Sugar Co. v. Wailuku Sugar Co.*, 15 Haw. 675, 680-81 (1904). But in doing so the court

---

[26] "Konohiki" traditionally indicated the head man of an ahupuaa land division under a chief. Subsequent to the Mahele it came to be used to indicate the grantee of an ili or ahupuaa and his successors in interest.

[27] The court stated as follows:

Surplus water. This, in our opinion is the property of the konohiki, to do with as he pleases, and is not appurtenant to any particular portion of the ahupuaa. By ancient Hawaiian custom this was so. Originally the King was the sole owner of the water as he was of the rest of the land and could do with either or both as he pleased. In later years, the rule seems to have been for him not to dispossess tenants of their lands except for cause and to that extent, perhaps, he would not have deprived cultivators of the water to which their lands were by usage entitled. But no limitation, so far as we can learn, ever existed or was supposed to exist to his power to use the surplus waters as he saw fit. There is no reason for supposing that such water was regarded as appurtenant to one portion of the arable land of an ahupuaa and not to another portion or for supposing that it was appurtenant to the arable land and not to the remainder of the ahupuaa. During recent years konohikis have in many instances diverted from the ahupuaa the surplus water either wholly or in large part. An argument based upon public policy or upon the necessity or wisdom of encouraging the cultivation of the soil upon a scale unknown and impossible in ancient times, cannot be of assistance, for a determination that the surplus water belongs, in accordance with ancient Hawaiian custom, to the konohiki is not less in favor of an enlarged measure of cultivation than would be a determination that such water belongs to the present holder of a particular portion of the ahupuaa.

defined surplus water as "water, whether storm water or not, that is not covered by prescriptive rights [or appurtenant rights] *and excluding also riparian rights,* if there are any." *Id.* at 680. By this reference to possible riparian rights, which had been alluded to but never explicitly adopted in this jurisdiction, the court left open the issue of the existence of this form of usufructory right that could only exist in derogation of the notion of surplus water. Thus, while the court may indeed have stated that surplus water was the "property" of the konohiki as between the two parties to that action, its definition of those waters clearly left to the future the development of other interests in water and therefore predicated the quantity and very existence of surplus after the satisfaction of those interests.

Thirteen years later in *Carter v. Territory,* 24 Haw. 47 (1917), the court was confronted with the problem of distributing storm waters that swelled a stream beyond its normal flow between two adjoining ahupuaas. Although the rule set forth in *Hawaiian Commercial, supra,* apparently required that such "storm and freshet" surplus be awarded to the konohiki of the ahupuaa of its origin, the court did not do so. It held instead that such waters were to be divided in accord with the riparian doctrine.

But thirteen years later our law respecting surplus water was again redefined. *Territory v. Gay, supra,* involved the competing rights of the konohiki of an ili kupono on which "normal daily" surplus waters originated and the konohiki of the surrounding ahupuaa. Issues related to the definition or quantification of such normal daily surplus were not implicated because the parties stipulated to the presence of such waters and left open the question of the rights of others. On the single question presented for determination, a divided court held that normal daily surplus "belonged" to the konohiki *of an ili kupono* upon which such waters were generated. The court reached no decision respecting storm and freshet surplus. Chief Justice Perry would have included such waters in normal daily surplus but was unable to convince a majority of the court to do so. Similarly there was no ruling with respect to the rights of others upon which the very existence of surplus water was contingent.

Thus, in the one hundred and twenty-five years between the Mahele and the *McBryde* opinion this court had issued three separate

opinions respecting surplus water,[28] with more than a decade between each. Each treated surplus water differently,[29] and in none of them did the court even attempt to clearly define or quantify the nature of this right. Any references to the problem was confined to discussion of the undelineated rights of others to a watercourse.

In our view, the concept of ownership is meaningless without some identification of the thing owned and the rights accompanying

----

[28] Reference to surplus water rights can also be found in Foster v. Waiahole Water Co., 25 Haw. 726 (1921); In re Taxes, Waiahole Water Co., 21 Haw. 679 (1913); Kaneohe Ranch v. Kaneohe Rice Mill Co., 20 Haw. 658 (1911). None of these cases however delineate the nature or scope of the water right.

[29] The development of the law governing surplus water can be graphically summarized as follows:

| | DEFINITION | | "OWNERSHIP" | |
|---|---|---|---|---|
| HC&S (1904) | all water, whether storm or not, not covered by prescriptive or riparian rights, if there are any. | | konohiki of ahupuaa of origin | |
| Carter (1917) | "normal daily": normal flow exceeding rights of others | "storm and freshet" waters which swell rivers beyond their normal flow | normal daily: konohiki of ahupuaa of origin | storm and freshet divided between ahupuaas in accordance to riparian doctrine |
| Gay (1930) | "normal daily" in stipulation of parties with one opinion urging the abandonment of Carter distinction between normal and storm and freshet and recognition of domestic appurtenant rights | | konohiki of ahupuaa or ili kupono of origin | |

Thus in the course of three opinions "surplus" water was defined, then redefined after which the redefinition was called into question. In those same opinions all surplus was first given the konohiki of the ahupuaa, then part of the surplus was to be divided pursuant to riparianism, then the part previously reserved to the konohiki of an ahupuaa was deemed to be the property of the konohiki of the ili or ahupuaa of origin. We believe that such law could hardly have been considered so settled as to preclude reconsideration.

such ownership that are also defined and capable of being acted upon. *See generally,* Snare, *The Concept of Property,* 9 Am. Phil. Q. 200 (1972). We do not believe that the concept of surplus water had ever been sufficiently delineated so that the ownership of such water could be considered settled to a point where further development of the doctrine was precluded.

Surplus water, as discussed in our cases, did not present a right to a fixed quantity of water; it was the residuum of the water in a natural watercourse after the rights of others had been accounted for. Thus until every other interest in a watercourse had been identified and quantified, there could be no actual identification of surplus. In at least two of our surplus water cases reference is made to potential private interests which would undermine the security of any identification or award of such water. In *HC&S, supra,* the court alluded to the possible existence of riparian rights by naming such rights as among those which may have to be satisfied prior to surplus being available. But it was not until *McBryde* that such rights were recognized. Similarly in *Gay, supra,* Justice Perry referred to an appurtenant domestic water right that adhered to *all lands* upon which tenants resided in ancient times. *Territory v. Gay, supra,* 31 Haw. at 395.[30] Such rights had never before been established in this jurisdiction. *Gay,* carried to its extreme, would have suggested a multitude of unasserted rights to every watercourse in the land, none of which had been defined in terms of quantity or flow and each of which would have jeopardized available surplus.

At the very least, both cases implicitly recognized that the court retained the right to acknowledge and enforce previously undefined usufructory interests that could only exist in derogation of what might have been considered surplus.

Even if surplus water were not subject to previously undefined usufructory interests and even if other interests in a watercourse could have been exhaustively identified and quantified, the variability of stream flow would have made virtually impossible the effective quantification of any surplus. This was further complicated by the difficulties created by the court's distinguishing "storm and freshet surplus" from "normal daily" surplus in *Carter.*

---

[30] In *McBryde* these rights were interpreted to constitute a part of the doctrine of riparianism applicable to this jurisdiction. 54 Haw. at 190-91, 504 P.2d at 1341.

Many of these problems were recognized in the arguments presented by the parties before this court in the original *McBryde* action. The trial court in *McBryde,* pursuant to what it perceived to be Justice Perry's "invitation" in *Territory v. Gay, supra,* awarded all surplus water to Gay & Robinson, without drawing any distinction between "normal" and "storm and freshet" surplus. This, of course, was in apparent contravention of *Carter v. Territory* and was partly responsible for the original appeal.

The positions urged by the private parties in the original appeal ran the gamut of conceivable formulations. Gay & Robinson, characterizing *Carter* as engendering "52 years of uncertainty", urged the court to overrule *Carter* and, as previously urged by Justice Perry in *Territory v. Gay,* to treat all surplus water as the property of the ili kupono or ahupuaa of its origin. Among the arguments advanced was the practical impossibility of effectively and meaningfully distinguishing between "normal daily" and "storm and freshet" surplus in practice.

McBryde Sugar Company argued for the retention of *Carter,* not only as the existing law of the land but as consistent with the practices of the ahupuaa from time immemorial. However, it argued in the alternative that:

> If this court determines that the rule of *Carter v. Territory* as to surplus storm and freshet flow should no longer be the law of Hawaii, then under any rule adopted by this court *all* surplus waters should be divided between the owners along the stream upon some equitable basis, whether it be *the riparian doctrine* modified to accord with Hawaiian practice, the rule of prior *appropriation as so modified, or some other just rule.*

McBryde Sugar Co., Ltd.'s Opening Brief at 83 (emphasis added).

Thus, even in the original *McBryde* action, the parties implicitly conceded that, far from being settled, the law governing surplus water was in a state of flux and confusion and that the court had both the power and the duty to reassess and resolve the situation.

## II.

The *McBryde* opinion, however, did not supplant the konohikis with the State as the owner of surplus waters in the sense that the State is now free to do as it pleases with the waters of our lands. In

*McBryde, supra,* we indeed held that at the time of the introduction of fee simple ownership to these islands the king reserved the ownership of all surface waters. 54 Haw. at 187, 504 P.2d at 1339. But we believe that by this reservation, a public trust was imposed upon all the waters of the kingdom. That is, we find the public interest in the waters of the kingdom was understood to necessitate a retention of authority and the imposition of a concomitant duty to maintain the purity and flow of our waters for future generations and to assure that the waters of our land are put to reasonable and beneficial uses. This is not ownership in the corporeal sense where the State may do with the property as it pleases; rather, we comprehend the nature of the State's ownership as a retention of such authority to assure the continued existence and beneficial application of the resource for the common good.[31]

The nature of this ownership is thus akin to the title held by all states in navigable waterways which was recognized by the United States Supreme Court in *Illinois Central Railroad v. Illinois,* 146 U.S. 387, 452 (1892):

> It is a title held in trust for the people of the State that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein freed from the obstruction and interference of private parties. . . . [The doctrine permits the State to grant the use of such waters to private parties] [b]ut that is a very different doctrine from the one which would sanction the abdication of the general control of the State over lands under the navigable waters of an entire harbor or bay, or of a sea or lake. Such abdication is not consistent with the exercise of that trust which requires the government of the State to preserve such waters for the use of the public. . . . The control of the State for the purposes of the trust can never be lost, except as to such

---

[31] The State unquestionably has the power to accomplish much of this through its police powers. *Hudson County Water Co. v. McCarter,* 209 U.S. 349 (1908). We believe however that the king's reservation of his sovereign prerogatives respecting water constituted much more than a restatement of police powers, rather we find that it retained on behalf of the people an interest in the waters of the kingdom which the State has an obligation to enforce and which necessarily limited the creation of certain private interests in waters. *See,* Sax, *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention,* 68 Mich. L. Rev. 471 (1970); Maloney, Ausness & Morris, *A Model Water Code, supra* at 81 (1972).

parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining. The extent of the state's trust obligation over all waters of course would not be identical to that which applies to navigable waterways.[32] That such powers and obligations exist, however, is not open to question. Native Hawaiian practices respecting water, the tradition from which our water law ostensibly springs, have been consistently described as aimed at maximizing benefits for those involved;[33] the first statute of the kingdom governing water describes the resource as a bounty "which god has provided [which] should be equally distributed, in order that there may be an equal distribution of happiness among all those who labor in those places", Laws of 1842, Respecting Water for Irrigation; and the first and only post-Mahele statute explicitly governing water rights provides that "[t]he people also shall have the right to drinking water, and running water and the right of way . . .", Enactment of Further Principles, Act of August 6, 1850, L. 1850 p. 202. We therefore can only believe that water was considered to be "so particularly the gifts of nature's bounty that they ought to be reserved for the whole populace", Sax, *The Public Trust Doctrine, supra* at 848, and that the reservation of the king's authority to "enforce the usufructs of the land for the common good", Laws of 1847 at 81, therefore represented an explicit

---

[32] As to the possible extent of the obligations and powers arising under this doctrine, *see*, Sax, *The Public Trust Doctrine, supra.*

[33] A recent study has characterized the ancient Hawaiian system of water allocation as follows:

Perhaps the essential feature of the ancient water system was that water was guaranteed to those natives who needed it, provided they helped in the construction of the irrigation system. Because agriculture was a matter of great importance to the Hawaiians, they were, in general, willing to contribute their efforts to the water system. The konohikis aimed to secure equal rights to all makaainana and to avoid disputes. Beneficial use of water by the makaainana were also essential to the continued delivery of water. The natives were subject to compulsory maintenance work on the auwais under the supervision of the konohiki. The konohiki, on the other hand, was reluctant to impose unreasonable burdens on the tenants because they were normally free to leave a particular plot if unhappy with the konohiki. Hence a "spirit of mutual dependence and helpfulness prevailed, alike among the high and low, with respect to the use of water." [Citations omitted.]

Van Dyke, Chang, Aipa, Higham, Marsden, Sur, Tagamori and Yukimoto, *Water Rights in Hawaii*, in Land and Water Resource Management in Hawaii, 141 (1977).

reservation on behalf of the people of the waters of the kingdom to the extent that such title enabled and required him to insure the effective application and preservation of the resource for the benefit of the general public. *See McBryde, supra,* 54 Haw. at 186-87, 504 P.2d at 1339.

The necessity for the reassertion of this interest in *McBryde* becomes readily apparent upon an examination of the possible impact of the private parties' interpretation of pre-*McBryde* water law. For pursuant to this reading, prior to *McBryde,* there existed no apparent common law restraint upon the right of private parties to drain rivers dry for whatever purposes they saw fit. Such a system may have been deemed both appropriate and beneficial in other historical contexts. But this is no longer the case. The reassertion of dormant public interests in the diversion and application of Hawaii's waters has become essential with the increasing scarcity of the resource and recognition of the public's interests in the utilization and flow of those waters.[34] In *McBryde* we were called upon to assess a division of the waters of the Hanapepe river among the landowners of the ahupuaa and adjoining ilis. To have done so exclusively in accord with Appellees' reading of pre-existing caselaw would have

---

[34] Since 1978, this necessity and obligation has been a part of our state constitution. Haw. Const. art. XI, § 1:

CONSERVATION AND DEVELOPMENT OF RESOURCES

Section 1. For the benefit of present and future generations, the State and its political subdivisions shall conserve and protect Hawaii's natural beauty and all natural resources, including land, water, air, minerals and energy sources, and shall promote the development and utilization of these resources in a manner consistent with their conservation and in furtherance of the self-sufficiency of the State.

All public resources are held in trust by the State for the benefit of the people. [Add Const Con 1978 and election Nov 7, 1978]

Haw. Const. art. XI, § 7:

WATER RESOURCES

Section 7. The State has an obligation to protect, control and regulate the use of Hawaii's water resources for the benefit of its people.

The legislature shall provide for a water resources agency which, as provided by law, shall set overall water conservation, quality and use policies; define beneficial and reasonable uses; protect ground and surface water resources, watersheds and natural stream environments; establish criteria for water use priorities while assuring appurtenant rights and existing correlative and riparian uses and establish procedures for regulating all uses of Hawaii's water resources. [Add Const Con 1978 and election Nov 7, 1978]

been a gross oversimplification of the interest involved. For while there indeed exist relative usufructory rights among landowners, these rights can no longer be treated as though they are absolute and exclusive interests in the waters of our state.

The *McBryde* opinion was only the beginning of a necessary definition of the parameters of the State's authority and interests in Hawaii's waters. These parameters, we believe, should be developed on a case by case basis or by the legislature as the particular interests of the public are raised and defined. However, the opinion properly clarified the nature of respective rights to water, that is, it made clear that underlying every private diversion and application there is, as there always has been, a superior public interest in this natural bounty.

*Andrew S. O. Lee,* Deputy Attorney General, for defendants-appellants George R. Ariyoshi, et al.

*Alexander C. Marrack (Hoddick, Reinwald, O'Connor & Marrack* of counsel) for plaintiffs-appellees Selwyn A. Robinson, et al.

*J. Russell Cades (Cades, Schutte, Fleming & Wright* of counsel) for defendant-appellee McBryde Sugar Co.

*William F. Quinn. (Goodsill, Anderson & Quinn* of counsel) for defendant-appellee Olokele Sugar Co.

*Robert B. Bunn (Cades, Schutte, Fleming & Wright* of counsel) (*Clinton I. Shiraishi, Shiraishi & Yamada* of counsel, with him on the brief) for defendants-appellees Ida Alborado, et al.