**Electronically Filed
Supreme Court
SCWC-17-0000181
10-MAR-2023
08:47 AM
Dkt. 33 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

HO'OMOANA FOUNDATION,
Respondent/Respondent/Appellant-Appellee,

vs.

LAND USE COMMISSION, STATE OF HAWAI'I,
Respondent/Petitioner/Appellee-Appellant,

and

PU'UNOA HOMEOWNERS ASSOCIATION, INC.; AND COURTNEY L. LAMBRECHT,
Petitioners/Respondents/Appellees-Appellees.

SCWC-17-0000181

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-17-0000173 consolidated with CAAP-17-0000181;
CIV. NO. 16-1-0160)

MARCH 10, 2023

NAKAYAMA, WILSON, AND EDDINS, JJ.,
AND McKENNA, J., DISSENTING, WITH WHOM RECKTENWALD, C.J., JOINS

OPINION OF THE COURT BY NAKAYAMA, J.

This case concerns a proposed overnight campground

development for unhoused and commercial campers on "class B"

land in an agricultural district near Lahaina, Maui.  At issue

is whether the Hoʻomoana Foundation's (the foundation) proposed campground project can be authorized by special use permit or whether a district boundary amendment is required. The specific exclusion of overnight camps from permitted uses in Hawaiʻi Revised Statutes (HRS) § 205-4.5(a)(6)[1] means that the public and private recreational use of overnight camps is not permitted in class A and B land in agricultural districts, and cannot be permitted by special use permit. In addition, Mahaʻulepu v. Land Use Commission, 71 Haw. 332, 790 P.2d 906 (1990), superseded by statute, 2005 Haw. Sess. Laws Act 205, §§ 2-3 at 669-71, which held that a use not permitted under HRS § 205-4.5(a)(6) could be authorized by special use permit, is overruled because it was

---

[1]    Hawaiʻi Revised Statutes (HRS) § 205-4.5 (Supp. 2015) "Permissible uses within the agricultural districts" provides in relevant part:

>    (a) Within the agricultural district, all lands with soil classified by the land study bureau's detailed land classification as overall (master) productivity rating class A or B and for solar energy facilities, class B or C, shall be restricted to the following permitted uses:
>
>        . . . .
>
>        (6)  Public and private open area types of recreational uses, including day camps, picnic grounds, parks, and riding stables, but not including dragstrips, airports, drive-in theaters, golf courses, golf driving ranges, country clubs, and overnight camps[.]
>
>        . . . .
>
>    (b) Uses not expressly permitted in subsection (a) shall be prohibited, except the uses permitted as provided in sections 205-6 and 205-8[.]
>
>        . . . .

2

incorrectly decided.  Because the foundation's proposed campground project includes a public or private recreational overnight camp use, the project requires a district boundary amendment.

## I.    BACKGROUND

## A.    Factual Background

The Land Use Commission (LUC) described the foundation's proposed campground project as follows:

DESCRIPTION OF THE PROPERTY

8.    The Property is situated along Hokiokio Place, adjacent to and bounded by the Lahaina Bypass Road between the Puamana Planned Unit Development and the agriculturally zoned Puʻunoa Subdivision . . . at Lahaina, Maui, Hawaiʻi. Kauaʻula Stream flows on one side of the Property.  The lots within the Puʻunoa Subdivision are situated immediately mauka of the Property.

9.    The Property consists of approximately 7.9 acres of land and represents a portion of the approximately 22.678-acre parcel[].

10.    The Property is situated within the State Land Use Agricultural District.

11.    The Property is owned by Kauaula Land Company, LLC, and is leased to Hoʻomoana.

12.    The Property has soil classified by the [Land Study Bureau's] detailed land classification as overall (master) productivity rating class B.  Specifically, the Property is situated on "B87i" rated land.

13.    The Property was previously used for sugarcane cultivation.

14.    In addition to the Property, [the parcel] includes an approximately 9-acre area used as a retirement stable for horses and approximately 5.8 acres that are part of the Lahaina Watershed Flood Control project area.

PROPOSED USE OF THE PROPERTY

15.    Hoʻomoana plans to develop the Project as an overnight campground for homeless and commercial campers with an

3

agricultural field for possible future uses by the campers on the Property. The name of the Project is Kauaula Campground.

16. Under Hoʻomoana's proposal, the Project would consist of 2 acres, while the remaining adjacent 5.9 acres would be reserved as an agricultural field to be used by the campground occupants for therapy and work. It is envisioned that the [homeless] campers may work in the agricultural field to supplement their rental fees. Homeless campers are expected to pay $10 a night, while the commercial campers would be charged more. The camping fees are anticipated to underwrite the expenses of the campground. Although some of the campers may wish to participate in farming activities on the Property, there is no guarantee that the agricultural field would result in future agricultural productivity nor is there a current requirement placed upon the campers to engage in agricultural pursuits.

17. The 2-acre area of the Project would have up to 26 pods for tents accommodating up to 80 people. Tents are to be provided by the campers. It is intended that both the homeless campers and the commercial campers would be camping alongside each other. In addition to the pods, showers, toilet facilities, fire pits or camp stove areas, a paved parking area, and a charging station for campers are proposed. Homeless campers would be allowed to stay for two to three months or more as approved by the campground manager. It is unclear how long commercial campers would be allowed to use the grounds, but any stay would need to be approved by the manager.

18. Hoʻomoana does not know whether there will be sufficient use to justify continued operations, nor does Hoʻomoana know whether the Project will prove successful in addressing some of the needs of the homeless [people] in West Maui.

19. The Project is being initiated on a trial basis.

(Footnotes omitted.)[2]

---

[2] No party challenged the LUC's Findings of Fact describing the property and the proposed campground project before the circuit court or before the Intermediate Court of Appeals (ICA). Findings of fact that are not challenged on appeal are binding on the appellate court. See Bremer v. Weeks, 104 Hawai'i 43, 63, 85 P.3d 150, 170 (2004).

**B.    Procedural History**

**1.    Administrative Proceedings**

The foundation filed an application for a special use permit with the Maui Planning Commission, which held a hearing regarding the application on July 28, 2015.

On December 4, 2015, the Puʻunoa Homeowners Association and its president Devonne Lane (the homeowners[3]) filed a petition with the LUC seeking a declaratory order that the campground project required a district boundary amendment and could not be authorized by a special use permit.  The homeowners live next to the proposed project site.  The homeowners argued that the foundation's proposed use did not promote the objectives of chapter 205 because there was no guarantee of agricultural activity at the proposed campground, making a special use permit unwarranted.

The County of Maui Department of Planning (Maui Planning Department); the Office of Planning, State of Hawaiʻi (State Planning Office); and the foundation all filed position statements with the LUC arguing that a special use permit, not a

---

[3]     Reference to "the homeowners" includes the Puʻunoa Homeowners Association and Devonne Lane until Ross Scott was substituted for Devonne Lane during the ICA proceedings on February 5, 2019.  From February 5, 2019 until February 8, 2023, "the homeowners" refers to the Puʻunoa Homeowners Association and Ross Scott.  On February 8, 2023, Courtney L. Lambrecht was substituted for Ross Scott.  From February 8, 2023 onward, "the homeowners" refers to the Puʻunoa Homeowners Association and Courtney L. Lambrecht.

district boundary amendment, is appropriate. The foundation also petitioned to intervene in the action.

On February 24, 2016, the LUC heard the homeowner's petition and the foundation's petition to intervene at a public meeting. The LUC heard testimony from nearby residents, and from the homeowners' counsel, the Maui Planning Department's counsel, the State Planning Office's counsel, and the foundation's counsel. A majority of the LUC voted to grant the homeowners' petition, and then unanimously voted to deny the foundation's motion to intervene as moot.

The LUC's March 3, 2016 declaratory order concluded that the campground project could not be permitted by special use permit and required a district boundary amendment. The LUC determined:

> 5.     In this case, the clear prohibition of overnight camps on class A and class B rated lands is irreconcilable with the provisions of HRS § 205-6 that permit certain "unusual and reasonable uses" within agricultural districts other than for which the district is classified. By expressly prohibiting overnight camps on class A and class B rated lands, the legislature effectively determined that the use of overnight camp facilities on class A and class B rated lands is unreasonable.
>
> 6.     To adopt the interpretation of Hoʻomoana, [the State Planning Office], and the [Maui Planning Department] that a special use permit may be used to allow the Project on class A and class B rated agricultural lands despite the clear language to the contrary would mean that the counties could define away completely any statutory restrictions on agricultural uses. It results in treating a clear and explicit statutory prohibition as a nullity, and it results in treating an implicit determination of the legislature that overnight camps on land classified as class A and class B is an unreasonable use on such land as a nullity, and as such must be rejected. The only way that overnight camps such as those proposed in the Project can be allowed

6

on the Property is to change its land use classification to one where overnight camps would be permitted. A change in the land use classification would require a district boundary amendment.

The LUC also filed an order denying the foundation's petition to intervene as moot.

## 2.    Circuit Court Proceedings

On March 29, 2016, the foundation appealed the LUC's declaratory order and order denying the foundation's motion to intervene to the Circuit Court of the Second Circuit (circuit court). The foundation asked the circuit court to reverse the LUC's orders. The foundation argued the plain language of HRS § 205-4.5(a)(6) does not mean that overnight camps can never be allowed, but rather means that overnight camps are not an "open area type of recreational use" and may be permitted if determined to be an "unusual and reasonable use[]." The foundation also argued the LUC failed to follow Maha'ulepu, which "found that HRS § 205-4.5(b) allows uses for which special permits may be obtained under HRS § 205-6"[4] and applies to the present matter.

_____

4     HRS § 205-6 (2017) provides in relevant part:

> (a) Subject to this section, the county planning commission may permit certain unusual and reasonable uses within agricultural and rural districts other than those for which the district is classified. Any person who desires to use the person's land within an agricultural or rural district other than for an agricultural or rural use, as the case may be, may petition the planning commission of the county within which the person's land is located for permission to use the person's land in the manner desired. Each county may

7

The LUC countered it properly interpreted HRS §§ 205-4.5 and 205-6: the more specific restrictions against overnight camps should prevail against the more general provisions for special use permits, and overnight camps can never be "reasonable" uses under HRS § 205-6 because they are explicitly excluded in HRS § 205-4.5.  Further, a contrary reading would render the specific restrictions against overnight camps a nullity, which should be avoided.

The homeowners argued the foundation was attempting to circumvent the land use laws and achieve spot zoning by seeking a special use permit.  The homeowners emphasized the Hawaiʻi Constitution and HRS chapter 205 both enshrine the protection of agricultural lands.

_____

establish the appropriate fee for processing the special permit petition.  Copies of the special permit petition shall be forwarded to the land use commission, the office of planning, and the department of agriculture for their review and comment.

. . . .

(c) The county planning commission may, under such protective restrictions as may be deemed necessary, permit the desired use, but only when the use would promote the effectiveness and objectives of this chapter; provided that a use proposed for designated important agricultural lands shall not conflict with any part of this chapter.  A decision in favor of the applicant shall require a majority vote of the total membership of the county planning commission.

. . . .

8

On February 16, 2017, the circuit court entered its Final Judgment in favor of the foundation, pursuant to its January 4, 2017 Findings of Fact, Conclusions of Law, and Order Vacating the Land Use Commission, State of Hawaiʻi's Decisions and Orders Entered on March 3, 2016. The circuit court held that overnight camps are allowable by special use permit. The circuit court held HRS § 205-4.5(a)(6) unambiguously means that overnight camps are not "open area types of recreational uses" and noted the relevant statutory language had been directly addressed in Mahaʻulepu.

3. **Intermediate Court of Appeals Proceedings**

The LUC and the homeowners appealed the circuit court's Final Judgment to the ICA.

Before the ICA, the LUC asserted that HRS § 205-4.5(a) creates three categories of uses: (1) expressly permitted uses, (2) uses not mentioned in HRS § 205-4.5(a) that are prohibited by default per HRS § 205-4.5(b) but can be approved by special permit, and (3) uses expressly not permitted under HRS § 205-4.5(a). Regarding the third category, the LUC explained, "[b]ecause the use is specified, that implies that the Legislature disapproves of the use and considers it inconsistent with the purposes of the land use statutes and the agricultural classification. Therefore, such a use should not be subject to the special permit process." (Footnote and citations omitted.)

9

The LUC argued that because the third category of uses fails to satisfy the criteria applicable to special permits as a matter of law, allowing such uses to go through the special permit process would be pointless.  The LUC noted HRS § 205-4.5(b) applies to uses subsection (a) is silent on, but does not apply to uses expressly not permitted.  As to Mahaʻulepu, the LUC argued that because the legislature clarified that golf courses cannot be authorized by special permit in 2005, the same should be presumed for the other uses excluded in HRS § 205-4.5(a)(6).

The homeowners contended that Mahaʻulepu is no longer good law and emphasized that the relevant legislative history evinces an intent to protect agriculture.

The foundation maintained the statute refers to two categories of uses: (1) expressly permitted uses and (2) all other uses that are prohibited by default, because the statute does not refer to "expressly not permitted" uses.  The foundation also noted that overnight stays on agricultural lands are not contrary to the objectives of chapter 205 because HRS § 205-4.5(a)(14) permits "[a]gricultural tourism activities, including overnight accommodations of twenty-one days or less . . . ."

On May 23, 2022 the ICA issued a memorandum opinion vacating the circuit court's decision with regard to the intervention issue and remanded.  The ICA concluded it was bound

by Mahaʻulepu, making the LUC's decision contradicting Mahaʻulepu palpably erroneous.  However, the ICA observed that the specific exclusion of overnight camps should control over the general availability of special permits in keeping with canons of statutory construction and furthering the statutory scheme.  The ICA issued its Judgment on Appeal on June 24, 2022.

**4.    Application for Writ of Certiorari**

In timely applications, the LUC and the homeowners both argue Mahaʻulepu should be overruled and special permits should not be used to approve expressly not permitted uses on class A and B agricultural land.

In response, the foundation argues the doctrine of stare decisis is particularly strong regarding statutory interpretation because if the legislature disagrees with a court's interpretation of a statute, the legislature can amend the law.  The foundation further contends overruling Mahaʻulepu is unwarranted.

The foundation's procedural due process argument regarding intervention raised before the circuit court and the ICA was not raised on certiorari, and as such will not be addressed.

## II.   STANDARDS OF REVIEW

### A.   Review of agency decisions

[T]he standard of review, as set forth in HRS § 91-14, is as follows:

Upon review of the record, the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions;

(2) In excess of the statutory authority or jurisdiction of the agency;

(3) Made upon unlawful procedure;

(4) Affected by other error of law;

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

HRS § 91-14(g).

Conclusions of law are reviewed de novo, pursuant to subsections (1), (2) and (4); questions regarding procedural defects are reviewable under subsection (3); findings of fact (FOF) are reviewable under the clearly erroneous standard, pursuant to subsection (5), and an agency's exercise of discretion is reviewed under the arbitrary and capricious standard, pursuant to subsection (6).  Mixed questions of law and fact are reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case.

In re Hawaiʻi Elec. Light Co., 145 Hawaiʻi 1, 10–11, 445 P.3d 673, 682–83 (2019) (cleaned up).

12

B.     **Statutory interpretation**

"The interpretation of a statute is a question of law which this court reviews de novo."  State v. Thompson, 150 Hawai'i 262, 266, 500 P.3d 447, 451 (2021) (citing State v. Ruggiero, 114 Hawai'i 227, 231, 160 P.3d 703, 707 (2007)).

> First, the fundamental starting point for statutory interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning.  Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself.

Ito v. Invs. Equity Life Holding Co., 135 Hawai'i 49, 61, 346 P.3d 118, 130 (2015) (quoting Haw. State Tchrs. Ass'n v. Abercrombie, 126 Hawai'i 318, 320, 271 P.3d 613, 615 (2012)).

## III. DISCUSSION

A.   **The uses specifically not permitted by HRS § 205-4.5(a)(6) cannot be authorized by special use permit.**

The state-level land use system is set out in HRS chapter 205.  Land in Hawai'i is divided into four land use districts: urban, rural, agricultural, and conservation.  HRS § 205-2(a) (2001).  Agricultural lands are further classified by soil productivity level from "A" to "E," with class A denoting the highest productivity level and class E denoting the lowest. Neighborhood Bd. No. 24 (Waianae Coast) v. State Land Use Comm'n, 64 Haw. 265, 267 n.2, 639 P.2d 1097, 1099 n.2 (1982). Under HRS § 205-4.5, agricultural districts are restricted to

13

certain uses, which depend on the productivity rating. Subsection (a) of HRS § 205-4.5 provides that class A and B agricultural lands "shall be restricted to the following permitted uses . . . ." Subsection (a) then enumerates permitted uses, such as "(1) [c]ultivation of crops, including crops for bioenergy, flowers, vegetables, foliage, fruits, forage, and timber;" and "(2) [g]ame and fish propagation . . . ." At issue here is the sixth enumerated use: "(6) [p]ublic and private open area types of recreational uses, including day camps, picnic grounds, parks, and riding stables, but not including dragstrips, airports, drive-in theaters, golf courses, golf driving ranges, country clubs, and overnight camps . . . ." (Emphasis added.)

Next, subsection (b) provides: "Uses not expressly permitted in subsection (a) shall be prohibited, except the uses permitted as provided in sections 205-6 [special permits] and 205-8 [nonconforming uses] . . . ."

HRS § 205-6 sets forth the law on special use permits. It provides: "the county planning commission may permit certain unusual and reasonable uses within agricultural and rural districts other than those for which the district is classified." HRS § 205-6(a) (emphasis added). Further, "[t]he county planning commission may, under such protective restrictions as may be deemed necessary, permit the desired use,

14

but only when the use would promote the effectiveness and objectives of this chapter . . . ." HRS § 205-6(c) (emphasis added).

The question before this court is whether the public and private open area types of recreational uses explicitly not permitted in HRS § 205-4.5(a)(6) – dragstrips, airports, drive-in theaters, golf courses, golf driving ranges, country clubs, and overnight camps – can be permitted by special use permit under HRS §§ 205-4.5(b) and 205-6.

"[T]he fundamental starting point for statutory interpretation is the language of the statute itself. . . . [O]ur foremost obligation [is] to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself." Invs. Equity Life Holding Co., 135 Hawai'i at 61, 346 P.3d at 130 (quoting Abercrombie, 126 Hawai'i at 320, 271 P.3d at 615).

Special use permits are available only for "unusual and reasonable uses" and "only when the use would promote the effectiveness and objectives of this chapter." HRS § 205-6(a) and (c). HRS § 205-4.5(a)(6) specifically lists uses that are not permitted in class A and B agricultural district land. By explicitly banning certain uses in HRS § 205-4.5(a)(6), the legislature indicated those uses on class A and B agricultural land are inherently not reasonable. Therefore, a plain reading

15

of the text demonstrates that special use permits are unavailable to authorize the public and private recreational uses of "dragstrips, airports, drive-in theaters, golf courses, golf driving ranges, country clubs, and overnight camps" because those are not reasonable uses on class A and B agricultural land.

Further, the statutory rule against superfluity establishes that special use permits are unavailable for the public and private recreational uses of "dragstrips, airports, drive-in theaters, golf courses, golf driving ranges, country clubs, and overnight camps" on class A and B agricultural land. "It is a cardinal rule of statutory construction that courts are bound to give effect to all parts of a statute, and that no clause, sentence, or word shall be construed as superfluous." State v. Bautista, 86 Hawai'i 207, 213, 948 P.2d 1048, 1054 (1997) (quoting State v. Ganal, 81 Hawai'i 358, 372, 917 P.2d 370, 384 (1996)). If special use permits were available for the explicitly not permitted uses listed in HRS § 205-4.5(a)(6), HRS § 205-4.5(a)(6)'s clause banning such uses would be superfluous. Therefore, to give effect to HRS § 205-4.5(a)(6)'s clause excluding the public and private recreational uses of "dragstrips, airports, drive-in theaters, golf courses, golf driving ranges, country clubs, and overnight camps" from

16

permitted uses on class A and B agricultural land, such uses cannot be permitted by special use permit.

Another principle of statutory interpretation confirms that HRS § 205-4.5(a)(6)'s specific list of not permitted uses controls over the general default rule and special use permit exception of HRS § 205-4.5(b).

> It is the generally accepted rule of statutory construction that unless a legislative intention to the contrary clearly appears, special or particular provisions control over general provisions, terms or expressions. . . . It is also elementary that specific provisions must be given effect notwithstanding the general provisions are broad enough to include the subject to which the specific provisions relate.

In re R Child., 145 Hawai'i 477, 485, 454 P.3d 418, 426 (2019) (quoting State v. Coney, 45 Haw. 650, 662, 372 P.2d 348, 354 (1962), overruled on other grounds by City and Cnty. of Honolulu v. Bonded Inv. Co., 54 Haw. 385, 507 P.2d 1084 (1973)). HRS § 205-4.5(a)(6)'s express list of not permitted uses is more specific than HRS § 205-4.5(b)'s default prohibition and general special use permit exception. As such, HRS § 205-4.5(a)(6)'s express list of not permitted uses controls.

A closer examination of HRS § 205-6 reinforces that special use permits are unavailable for the public and private recreational uses of "dragstrips, airports, drive-in theaters, golf courses, golf driving ranges, country clubs, and overnight camps" on class A and B agricultural land. Using class A and B agricultural land for such uses of "dragstrips, airports, drive-

17

in theaters, golf courses, golf driving ranges, country clubs, and overnight camps" does not appear to promote the objectives of HRS chapter 205, which is required by HRS § 205-6(c) to qualify for a special use permit. See HRS § 205-6(c) ("The county planning commission may, under such protective restrictions as may be deemed necessary, permit the desired use, but only when the use would promote the effectiveness and objectives of this chapter . . . ." (emphasis added)).

The "overarching purpose" of HRS chapter 205 is to "protect and conserve natural resources and foster intelligent, effective, and orderly land allocation and development." Kauaʻi Springs, Inc. v. Planning Comm'n of Cnty. of Kauaʻi, 133 Hawaiʻi 141, 169, 324 P.3d 951, 979 (2014) (quoting Curtis v. Bd. of Appeals, Cnty. of Haw., 90 Hawaiʻi 384, 396, 978 P.2d 822, 834 (1999)). Relevant here, HRS chapter 205 is intended in part to protect agricultural land for agricultural use. See HRS § 205-2(a)(3) ("In the establishment of the boundaries of agricultural districts the greatest possible protection shall be given to those lands with a high capacity for intensive cultivation[.]"); Curtis, 90 Hawaiʻi at 396, 978 P.2d at 834 (noting that one of the purposes of HRS chapter 205 is to "[u]tilize the land resources in an intelligent, effective manner based upon the capabilities and characteristics of the soil and the needs of the economy" (emphasis added) (quoting H. Stand. Comm. Rep. No.

395, in 1961 House Journal, at 855-56)). Moreover, the legislature declared that "the people of Hawaii have a substantial interest in the health and sustainability of agriculture as an industry in the State. There is a compelling state interest in conserving the State's agricultural land resource base and assuring the long-term availability of agricultural lands for agricultural use . . . ." HRS § 205-41 (2017). HRS § 205-41 was enacted pursuant to article XI, section 3 of the Hawaiʻi Constitution, which enshrines the protection of agricultural lands: "The State shall conserve and protect agricultural lands, promote diversified agriculture, increase agricultural self-sufficiency and assure the availability of agriculturally suitable lands."

Thus, in addition to the foregoing reasons, it appears special use permits cannot authorize the public and private recreational uses of "dragstrips, airports, drive-in theaters, golf courses, golf driving ranges, country clubs, and overnight camps" on class A and B agricultural land, because these uses of class A and B agricultural land do not appear to promote the objectives of chapter 205, as required by HRS § 205-6(c).

In sum, HRS §§ 205-4.5(a)(6) and 205-6 are clear: the "public and private open area types of recreational uses" of "dragstrips, airports, drive-in theaters, golf courses, golf driving ranges, country clubs, and overnight camps" are not

permitted on class A and B agricultural land, and cannot be permitted by special use permit.[5]

## B. A district boundary amendment is required for the foundation's proposed campground.

Public and private recreational uses of "dragstrips, airports, drive-in theaters, golf courses, golf driving ranges, country clubs, and <u>overnight camps</u>" are not permitted uses on class A and B rated agricultural land and cannot be subject to a special use permit.  (Emphasis added.)

The foundation's proposed campground is clearly an "overnight camp" within the meaning of HRS § 205-4.5(a)(6).  The LUC found that "Hoʻomoana plans to develop the Project as an overnight campground . . . The name of the Project is Kauaula Campground."[6]  The campground project is intended for recreational use by commercial campers, in addition to use by unhoused campers.  Because the campground project includes a

_____

[5] This opinion does not construe "overnight accommodations" within the meaning of HRS § 205-2(d)(12), relating to agricultural tourism activities, because this issue was not raised on certiorari, except briefly by the foundation in the separate context of arguing Mahaʻulepu v. Land Use Commission, 71 Haw. 332, 790 P.2d 906 (1990), superseded by statute, 2005 Haw. Sess. Laws Act 205, §§ 2-3 at 669-71, was not abrogated.

[6] In its answering briefs before the ICA, the foundation argued the record is inadequate because it does not include the special use permit application.  The special use permit application is not in the record, though the homeowners appear to have attached excerpts of the special permit application as an exhibit.  The foundation did not raise the issue on certiorari.  Given our disposition in this case – that the special use permit procedure is not available for overnight camps on class A and B rated agricultural district land – the fact that the special use permit is not in the record is inconsequential.  Throughout its briefing, the foundation admitted it is "seeking a special use permit for the operation of an overnight campground."

recreational use of an overnight camp, the project cannot be authorized by special use permit.  Accordingly, the proposed campground requires a district boundary amendment to change the land use classification to one where recreational overnight camps are permitted.  See generally HRS § 205-3.1 (2005).

## C.    Maha'ulepu v. Land Use Commission is overruled.

Maha'ulepu v. Land Use Commission, 71 Haw. 332, 790 P.2d 906 (1990), superseded by statute, 2005 Haw. Sess. Laws Act 205, §§ 2-3 at 669-71, rests on flawed statutory analysis and was incorrectly decided.

> "[A] court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it."  Dairy Rd. Partners v. Island Ins. Co., 92 Hawai'i 398, 421, 992 P.2d 93, 116 (2000) (quoting State v. Stocker, 90 Hawai'i 85, 95, 976 P.2d 399, 409 (1999)). Nevertheless, "there is no necessity or sound legal reason to perpetuate an error under the doctrine of stare decisis."  State v. Garcia, 96 Hawai'i 200, 206, 29 P.3d 919, 925 (2001) (quoting Robinson v. Ariyoshi, 65 Haw. 641, 653 n.10, 658 P.2d 287, 297 n.10 (1982)).  The doctrine is "subordinate to legal reasons and justice and we should not be unduly hesitant to overrule a former decision when to do so would bring about what is considered manifest justice." Ariyoshi, 65 Haw. at 653 n.10, 658 P.2d at 297 n.10 (quoting McBryde Sugar Co. v. Robinson, 54 Haw. 174, 180, 504 P.2d 1330, 1335 (1973)).

State v. Chang, 144 Hawai'i 535, 553, 445 P.3d 116, 134 (2019). Maha'ulepu is overruled because inescapable logic and the cogent reasons enumerated above require it.  The statutory analysis in Maha'ulepu is flawed, and "there is no necessity or sound legal reason to perpetuate an error under the doctrine of stare decisis."  Garcia, 96 Hawai'i at 206, 29 P.3d at 925.

Maha'ulepu held that golf courses on class A and B agricultural land can be authorized by special use permit under HRS §§ 205-4.5(b) and 205-6, despite the fact that golf courses are not a permitted use on class B agricultural land under HRS § 205-4.5(a)(6). Maha'ulepu, 71 Haw. at 336-37, 790 P.2d at 908-09. The opinion did not reconcile HRS § 205-4.5(a)(6)'s list of explicitly not permitted uses with HRS § 205-4.5(b)'s and HRS § 205-6's special use permit provisions. Instead, the opinion analyzed the effect of Act 298 - the 1985 amendment to HRS § 205-2 relating to golf courses - on HRS § 205-4.5(b). Id. at 337-38, 790 P.2d at 909-10. Because Maha'ulepu failed to engage with the plain language of HRS § 205-4.5(a)(6) prohibiting certain uses in class A and B agricultural districts, ignored principles of statutory interpretation, and failed to effectuate the purpose of the statutory scheme, it is overruled.[7]

### IV. CONCLUSION

The specific exclusion of overnight camps from permitted uses in HRS § 205-4.5(a)(6) means that the public and private recreational use of overnight camps is not permitted, even by special use permit, on class A and B agricultural district land. Accordingly, the foundation's proposed

---

[7] The LUC's contention that the foundation waived its argument regarding Maha'ulepu will not be addressed in light of this decision overruling Maha'ulepu.

22

campground project requires a district boundary amendment.

Further, <u>Mahaʻulepu v. Land Use Commission</u>, 71 Haw. 332, 790 P.2d 906 (1990), <u>superseded by statute</u>, 2005 Haw. Sess. Laws Act 205, §§ 2-3 at 669-71, was incorrectly decided and is overruled.

Accordingly, we reverse the ICA's June 24, 2022 Judgment on Appeal.

Robert T. Nakatsuji
(Kimberly T. Guidry
on the briefs) for
petitioner Land Use
Commission

Douglas R. Wright
(Deborah K. Wright on
the briefs) for petitioners
Puʻunoa Homeowners Association,
Inc. and Courtney L. Lambrecht

James W. Geiger for
respondent Hoʻomoana
Foundation

/s/ Paula A. Nakayama

/s/ Michael D. Wilson

/s/ Todd W. Eddins

